Walter BERGMAN and James Drummond, Personal Representative of the Estate of Frances Bergman, Deceased, Plaintiffs,

v.

UNITED STATES of America; Barrett G. Kemp, individually and as a former employee of the Federal Bureau of Investigation, and four unknown agents of the Federal Bureau of Investigation, Thomas J. Jenkins, individually and as a former employee of the Federal Bureau of Investigation, Defendants.

No. G77–6.

United States District Court, W.D. Michigan, S.D.

May 31, 1983.

Opinion on Reconsideration, of Sanctions May 24, 1983.

Opinion on Liability May 28, 1983.

See also, 551 F.Supp. 407.

William H. Goodman, Goodman, Eden, Millenden & Bedrosian, Neal Bush, Bush, Bennett & Magid, Mark Granzotto, Deborah LaBelle, Detroit, Mich., for plaintiffs.

John J. Farley, III, Director, Torts Branch, Civ. Div., U.S. Dept. of Justice, R. Joseph Sher, Asst. Director, Torts Branch, Nicki L. Koutsis, Trial Atty., U.S. Dept. of Justice, Washington, D.C., for defendants.

ENSLEN, District Judge.

## ON MOTION TO COMPEL PRODUCTION

After rendering an Opinion from the Bench on March 3, 1983 on Plaintiffs' Motion to Compel the Production of Documents, the Court, so as to more fully set forth the basis of that decision, issues the following written Opinion. Based upon an asserted privilege which protects the government from disclosing the identity of its confidential informers, Defendants objected to certain of Plaintiffs' requests for production of documents. After attempted conciliation between the parties with regard to the informer's privilege failed, the Court was requested to intervene in the resolution of this dispute.

The leading federal decision with regard to the government's privilege against disclosure of the identity of informers is *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), where the Supreme Court declared that:

What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. *Scher v. United States,* 305 US 251, 83 L ed 151, 59 S Ct 174; *Re Quarles,* 158 US 532, 39 L ed 1080, 15 S Ct 959; *Vogel v. Gruaz,* 110 US 311, 316, 28 L ed 158, 160, 4 S Ct 12 [14]. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes

the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation. The scope of the privilege is limited by its underlying purpose. *Id.* at 59–60, 77 S.Ct. at 627.

The court acknowledged that this privilege, which exists to protect the public interest and the free flow of information to law enforcement entities, is limited by nature. With regard to the limitation on the applicability of the privilege, the court specifically stated that it:

> ... arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication. *Id.* at 60–61, 77 S.Ct. at 627–628. (Footnotes omitted.)

In footnote 8, the court states, with no mention of the informant's family, that the death of the informant dissolves the privilege.

Finally, *Roviaro* states that the Court must consider the particular circumstances of each case, the possible significance of the informer's testimony, and any other relevant factors in balancing the respective interests.

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow

of information against the individual's right to prepare his defense. *Id.* at 62, 77 S.Ct. at 628.

Based upon the foregoing, the Court must balance Plaintiffs' right to prepare their case against the public interest in protecting the free flow of information.

In *Timken Roller Bearing Company v. United States,* 38 F.R.D. 57 (ND Ohio 1964), the court indicated that:

> There is very little authority on the applicability of the informer's privilege to civil cases ... *Id.* at 66.

While that language suggests there may be no privilege which the government may assert in civil matters, the court nonetheless proceeded to order the production of those documents for an *in camera* inspection to determine whether "the statements 'would not embarrass the informants in their social relations or their employment or endanger their safety.'" *Id.* at 66, quoting with approval *Mitchell v. Bass,* 252 F.2d 513 (CA 8 1958).

Five years later, in *Wirtz v. International Printing Pressmen & Assistants' Union of North America, AFL–CIO,* 47 F.R.D. 58 (ED Tenn.1969), Judge Neese applied the privilege and concluded that disclosure was not essential to a fair determination of the issues before him. Based upon a comparison of the *Timken* and *Wirtz* cases, it is apparent that there exists a split of authority over the applicability of the informer's privilege to a civil lawsuit.

The informer's privilege has been well recognized as essential to effective enforcement of the Fair Labor Standards Act. *Hodgson v. Keeler Brass Company,* 56 F.R.D. 126 (WD Mich.1972); *Dunlop v. Carriage Carpet Company,* 548 F.2d 139 (CA 6 1977); and the opinion of the Hon. Benjamin F. Gibson in *Usery v. Brandel,* 87 F.R.D. 670 (WD Mich.1980). Likewise, the privilege has been applied in matters alleging violations of the Sherman Act. *United States v. Lorain Journal Company,* 10 F.R.D. 487 (ND Ohio 1950).

*Westinghouse Electric Corporation v. Burlington,* 351 F.2d 762 (DC Cir.1965), in-

volved a private treble-damages antitrust action, wherein the government asserted the privilege as a ground for quashing a subpoena *duces tecum* served by the defendants upon the Attorney General seeking the discovery of complaints filed with the government by utilities against electrical equipment manufacturers, it was noted that the policies behind the privilege and its exceptions extended to civil as well as criminal cases, and that there was no logical reason to set up two different privileges, one for civil and the other for criminal cases. Holding that the district court had not applied the proper standards in sustaining the privilege claim, the Court of Appeals remarked that most informers presumably do not want their names to be revealed in either civil or criminal proceedings, and that the competing interest, when balanced under the principles enunciated in *Roviaro,* should be struck in each case, be it civil or criminal, toward determining whether disclosure was essential in maintaining fairness. The court, however, also added that a Sherman Act treble damages action was not wholly a private civil action.

■ Although some cases hold to the contrary, *Brennan v. Automatic Toll Systems, Inc.,* 60 F.R.D. 195 (SD N.Y.1973), I find, after having reviewed all pertinent decisional authority, that the informer's privilege is applicable to civil and criminal cases alike. The prevailing view is contained in the Supreme Court's language in *Roviaro* that the informer's privilege, and the compelling interests underlying that privilege, are essentially the same in criminal and civil cases. *See e.g., Socialist Workers Party v. Attorney General,* 565 F.2d 19 (CA 2 1977), *cert. den.,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978).

■ In *Hampton v. Hanrahan,* 600 F.2d 600 (CA 7 1979), the United States Court of Appeals for the Seventh Circuit noted that:

The determination of the guilt or innocence of a criminal defendant has been characterized as qualitatively more significant than civil litigation, thus justifying a higher threshold of justification for exceptions to the privilege in civil cases.

However, the difference in "significance" of criminal and civil cases simply should be considered another factor in the *Roviaro* balancing test. Further, the proposition that all civil cases are less significant—and therefore require a higher level of justification for the disclosure of the identity of the informer—than all criminal cases is a dubious one. It would seem impossible to conclude absolutely that every criminal misdemeanor case is "more significant" than civil actions to redress, for example, egregious violations of an individual's rights. *Id.* at 637, n. 40.

Accordingly, the privilege may be asserted in civil actions, although, as can be gleaned from my previous remarks, it is a qualified privilege, subject to certain exceptions. Again, borrowing from *Hampton:*

Since *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it has been clear that the so-called informer's privilege (the privilege that protects the identity of a person which otherwise would be required to be disclosed during the course of litigation) is not absolute. In *Roviaro* the Court said, "Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id* at 60–61, 77 S.Ct. at 628. The Court went on to explain the test to be applied to determine when disclosure is required:

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Id.* at 636–637.

The balancing process must take into consideration that an "[informer's] identity cannot be concealed from the defendant

when it is critical to his case," *Branzburg v. Hayes,* 408 U.S. 665, 698, 92 S.Ct. 2646, 2665, 33 L.Ed.2d 626 (1972). *See also, United States v. Edings,* 478 F.2d 67, 70 (CA 6 1973); *United States v. McManus,* 560 F.2d 747, 751 (CA 6 1977). "[W]hen the evidence suggests . . . that it is reasonably probable that the informer can give relevant testimony, the burden should be on the Government to overcome this inference with evidence that the informer cannot supply information material to the defense." *United States v. Edings,* 478 F.2d at 71.

■ Here, the interests of the government in protecting the safety of informers and continuing the unimpeded flow of information has been stated at length. What may escape analysis, however, is the interest of the Plaintiffs in a full and fair determination of their cause. In that regard, the case of *Hampton v. Hanrahan, supra,* is particularly relevant and helpful to the Court. *Hampton* was a civil rights action for monetary damages brought by members of the Black Panther Party and the mothers of two deceased party members against federal and state law enforcement officers. The suit arose from a gun battle which occurred in Chicago during the early morning hours of December 4, 1969. Two Black Panthers were killed and four others were injured by the gunfire. The plaintiffs alleged a conspiracy to deprive the occupants of the apartment where the gunfire and injuries occurred of the equal protection of the laws in violation of several sections of the Civil Rights Act. A critical question in that case concerned the government's claim of privilege for an informant, whose representations led to the issuance of a search warrant for the apartment. 600 F.2d at 638–639. In remanding the case to the district court for a new trial, the Seventh Circuit Court of Appeals determined that a just adjudication of plaintiffs' claims required that the informant's identity be disclosed, subject to a restrictive protective order.

After considering all possible alternatives, I can find no reason to reach a different result in the case at bar. As in *Hampton,* the instant Plaintiffs have asserted a conspiracy on the part of the government and breach of duty owing by the government to the Plaintiffs. Necessary to a resolution of those claims is a determination of whether and to what extent the FBI had prior knowledge of the planned violence in Alabama. Any information which the FBI possessed was gained through confidential informants and documentation generated through the use of those informants. After carefully scrutinizing the interests of the parties, I concluded that, on balance, the government's interest in encouraging the free flow of information and in protecting past informants must yield to Plaintiffs' rights.

I recognize in this decision, beyond risk of peradventure, that the burden is on Plaintiffs to demonstrate that disclosure is necessitated. I find that the evidence introduced to date reveals substantial need by Plaintiffs to discover evidence, and I conclude that this need meets the burden required by *Roviaro.* Therefore, the government's asserted privilege is overcome by Plaintiffs' need for the information. The age of the informant's information, 22 years, is included among the factors which tip the balance in Plaintiffs' favor. Another factor in Plaintiffs' favor is that to date the government has consistently refused to verify whether *any* or all of its informants are still living. Footnote 8 of the *Roviaro* opinion, convinces me that the privilege ceases to exist with the death of the informant.

■ I recognize that this decision, ordering the government to turn over to the Plaintiffs the documents which I have reviewed *in camera,* creates a potential problem. Although I have determined that the balance weighs in Plaintiffs' favor, I am concerned for the informers, and in an effort to reduce any potential problems to a live informant, if there be any, I will require that the disclosure be made in Chambers under a strict protective order, which will require that counsel not disclose information gained in Chambers to any other person, including their clients, and that they shall utilize such information only in

furtherance of the claims here present. I will do this out of the concern for some person who may or may not still require protection, or who may or may not be alive.

Based on the foregoing, Plaintiffs' Motion to Compel *all* Defendants to produce documents is, hereby, granted.

## ON RECONSIDERATION OF SANCTIONS

On March 7, 1983, after a full week of trial and repeated refusals on the part of Defendants to comply with discovery orders, this Court imposed sanctions upon the Defendants pursuant to Fed.R.Civ.P. 37(d) and 37(b)(2)(A) and (B). A copy of that Opinion, which was rendered in open court, is attached hereto as an Appendix[1]. Presently this matter is before the Court on the "Response of the United States to the Plaintiffs' Submission with Respect to Sanctions and Suggestion of Reconsideration," which the Court will treat as a Motion for Reconsideration.

The documents submitted by the Defendants seriously mischaracterize the events which led up to the imposition of sanctions. For that reason, a review of these events appears to be warranted.

Discovery problems have plagued this lawsuit from its inception in 1977. Although Plaintiffs had moved to compel pro-duction on several occasions, the Court was not initially required to resolve those motions because, from time to time, the government opted to release some materials. In fact, during a pretrial conference, defense counsel remarked that voluntary disclosure of material by the government to Plaintiffs varied with the year, and that earlier "policy" had been more restrictive than "recent policy." Eventually, however, when agreement could not be reached between counsel, the Court intervened in the discovery disputes and issued production orders.

In an Order dated December 29, 1982 Defendants were directed to produce certain documents which had been requested by Plaintiffs. In an *ex parte* letter to the district court dated January 12, 1983, Edward C. Schmults, Deputy Attorney General of the United States, apparently acting on behalf of all Defendants but not a previous signator of pleadings, refused to comply with the Court's Order. Schmults instead made three suggestions as partial alternatives: (1) appoint a magistrate to review *in camera;* (2) appoint a special master to review *in camera;* or (3) the Court itself could make such an *in camera* review. Despite the tone of the letter, in which Schmults seemed to confuse the role of the executive branch with that of the judicial,[2]

---

1. The appendix is drafted from my handwritten notes utilized in rendering the oral Opinion, and not from the transcript of the proceedings.

2. The following are excerpts from the Schmults letter:

This letter is in response to the Order of December 29, 1982, entered in the case of *Bergman v. United States, et al.,* ... *I have come to the conclusion* that compliance with the order under these circumstances would present a serious threat to the ability of federal investigative agencies and their internal inspection units to perform their critically important function.

\* \* \* \* \* \*

... *I must conclude* that further release to the plaintiffs would be inimical to the public interest.

\* \* \* \* \* \*

The present circumstances are fundamentally different [from those in criminal prosecutions]. No opportunity to balance the bene-fits of disclosure against its costs is available to the Department; we cannot elect to dismiss this action. *Nor can we accept the basis for the Order:* that having *alleged* misconduct by the FBI a generation ago, the plaintiffs' inability to provide any evidence to support their charges is itself a basis for ordering disclosure of confidential informant information.

\* \* \* \* \* \*

*Disclosure to the plaintiffs,* or their counsel, even under protective order, *is unacceptable.*

\* \* \* \* \* \*

... *I have concluded* that compliance with the Order of December 29, 1982, would reveal confidential informants and adversely affect the public interest. *I cannot conclude that administration of justice requires disclosure; in fact, I must conclude to the contrary, that the administration of justice requires that the material not be disclosed.* Therefore, pursuant to the authority and responsibility delegated to me by the Attorney Gener-

I adopted the first suggestion, and the documents were dispatched to United States Magistrate Stephen W. Karr for an *in camera* inspection.

Following four full days of exhaustive examination and review, Magistrate Karr completed a Report and Proposed Findings of Fact which was forwarded to the Court on February 11, 1983. By Order dated February 16, 1983 the Court adopted that report and the proposed findings pursuant to Fed.R.Civ.P. 52. Defendants incorrectly state that the *in camera* inspection by Magistrate Karr had completely resolved discovery problems and that "the Plaintiff was in the same position he would have been in had he been permitted access to the informant material." In fact, the Magistrate's review of the documents disclosed that additional production was necessary, and on February 16, 1983 further *in camera* inspection was ordered by the Court.

Defendants further erroneously characterize the matter by stating that "when the trial in this case began on February 28, it was assumed that the informant matter was resolved...." Inasmuch as the informant problem was still awaiting resolution on that date, nothing could be further from the truth. Moreover, Defendants' statement is very curious because the additional body of materials had not been timely delivered to the Court's Chambers, and even during trial defense counsel was unable to assure the Court that all of the materials ordered produced had been delivered.

Early in the trial it became increasingly clear to me, as well as to Plaintiffs' attorneys, that the procedures suggested by Deputy Attorney General Schmults regarding fact finding following an *in camera* inspection by the Court were unjust. Plaintiffs' objections to the procedures proposed by Schmults fall into two broad categories. First, Plaintiffs submit that in interpreting the contents of the documents in question, it would be humanly impossible for the court or a magistrate to glean every piece of significant evidence in this case. Such a

procedure would have made it virtually impossible for this Court, or a magistrate, to conduct its analysis with a sufficient level of knowledge of the evidence sought by Plaintiffs. *See Ingle v. Department of Justice,* 698 F.2d 259, 263 (CA 6 1983). Due to the complex nature of the legal and factual issues involved and the sheer bulk of the documents, it is inconceivable that a review of those documents by the Court or a magistrate could have adequately served the requirements of the Plaintiffs.

Plaintiffs' second objection to the proposed procedure involves their inability to participate in all phases of the fact finding process. Although the government's proposals would have resulted in this Court making findings of fact, Plaintiffs would have had no opportunity to propose findings. Of equal importance, Plaintiffs would have been unable to challenge such findings because they would not have had access to the documents. In addition, defense counsel added condition upon condition to their proposals, eventually rendering worthless any *in camera* procedure leading to fact findings.

After the proposals of the Defendants proved unjust and impracticable, the Plaintiffs urged me to examine the still unresolved assertion of the qualified and limited informant's privilege. From the outset, I was concerned about jeopardizing the lives of past informants, and the public interest in protecting the flow of information from informant sources. However, I was equally concerned with affording Plaintiffs a full opportunity to present evidence that was essential to a fair determination of their cause. On balance, in an Opinion delivered in open court on March 3, 1983, I concluded that the government's interest must give way. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In so doing, I also relied in part on the recent decision of *Hampton v. Hanrahan,* 600 F.2d 600 (CA 7 1979), where a civil rights action for monetary damages had been brought by members of the Black Panther Party and

al (28 C.F.R. 16.25), I must by copy of this letter, instruct the responsible employees of

the Department not to comply with the Order of December 29, 1982. (Emphasis supplied.)

the mothers of two deceased party members against federal and state law enforcement officers. The suit arose from a gun battle which occurred in Chicago during the early morning hours of December 4, 1969. Two Black Panthers were killed and four other members were injured by the gunfire. On appeal, the Seventh Circuit Court of Appeals reversed a directed verdict for the defendants and remanded for a new trial. Analogous to the instant controversy was the allegation in *Hampton* of an alleged conspiracy to deprive the occupants of the apartment where the gunfire and injuries occurred, of the equal protection of the laws in violation of several sections of the Civil Rights Act. A key question in the litigation concerned whether an informant, whose representations led to the issuance of a search warrant for the apartment, existed or was reliable. The *Hampton* court opined at 638–639:

> A determination that Groth's informant did not exist would have significant ramifications for plaintiffs' case. The warrant used to gain entry to the apartment would be supported only by the misrepresented, triple hearsay Groth received from Jalovec, and Groth's own perjured statement. Perhaps more importantly, such a conclusion would bolster plaintiffs' conspiracy claims. It would be powerful evidence of Groth's bad faith vis-a-vis plaintiffs. And it would highlight the importance of the federal defendants in the alleged conspiracy. If O'Neal was the only eyewitness informant able to provide the crucial pre-raid information about the apartment, there could be no question that he and his conduit to the state defendants, Mitchell, were indispensable to the entire operation.

> Even if Groth did have an informant, disclosure of his identity would be important to a resolution of the case since that informant might be a critical figure in the conspiracy alleged by plaintiffs. If O'Neal, who was being paid for his work by the federal defendants, was also the informant Groth relied on in his affidavit, plaintiffs would have additional evidence of the federal involvement in the raid

itself. Further, the person described by Groth as his informant—according to Groth a member of the BPP—could be a coconspirator. Groth said that his informant asked when he was going to "move on the crib," and provided information about the weapons when told that the presence of weapons in the apartment would precipitate a raid. Also, as a member of the BPP, Groth's informant may have been in the apartment or at least with Hampton the night before the raid—an important fact given the testimonial and scientific evidence introduced by plaintiffs suggesting that Hampton had been drugged prior to the raid.

Disclosure of Groth's informant's identity is "essential to a fair determination" of this case. *Roviaro, supra,* 353 U.S. at 61, 77 S.Ct. 623. The plaintiffs' request for disclosure is based neither on mere speculation about the informant's identity, *see United States v. Prueitt,* 540 F.2d 995 (9th Cir.1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977), nor on a desire to extract punitive damages from an additional defendant. *See Black v. Sheraton Corp. of America,* 184 U.S.App. D.C. 65, 564 F.2d 550 (1977). We are mindful of "the public interest in protecting the flow of information," *Roviaro, supra,* 353 U.S. at 62, 77 S.Ct. at 629, but we also are aware of the need to maintain the integrity of and confidence in the criminal justice system. *The assertion of informer's privilege by a law enforcement official defending against a civil suit for damages based on his own alleged official misconduct should be scrutinized closely.*

\* \* \* \* \* \*

This case, in which plaintiffs have alleged gross misconduct by federal and state law enforcement officials and have presented serious evidence to support these claims, is of paramount significance. There is a serious factual controversy focusing on the existence or identity of Groth's informant, and a resolution of this controversy is essential to a just adjudication of plaintiffs' claims. Thus, we conclude that the public's interest in encouraging the flow

of information to law enforcement officials cannot prevail in this case, and that Groth must disclose the identity of his informant. In order to minimize both the risks to this particular informant and any adverse effects on law enforcement generally, we suggest that the appropriate parties move at the retrial for a protective order to set the terms of this disclosure. (Emphasis supplied).

I could discover no reason and could employ no logic, neither then nor now, that is persuasive of a different result here. Plaintiffs have asserted a conspiracy on the part of the government and a breach of a duty owing by the government to the Plaintiffs. Critical to a resolution of those claims is a determination of whether and to what extent the FBI had prior knowledge of planned violence in Anniston and Birmingham. Any information which the FBI had was gained exclusively through the use of confidential informants and documentation generated through the use of informants. Closely scrutinizing the interest of the government in the balancing process revealed that the interests of the government in encouraging the free flow of information and in protecting past informants must, on balance, yield to the Plaintiffs' superior right to discover, especially since the Plaintiffs had already presented serious evidence to support their claims.

While the record is clear and unambiguous on this Court's discovery orders, and subsequent sanctions for non-compliance, a curious, and wholly gratuitous submission by the government was filed, following trial, on March 18, 1983. It was styled: "Response of the Defendant of (sic) the United States to the March 5, (sic)[3] 1983, Order of the Court," and was signed by William H. Webster, Director of the FBI; and by Edward C. Schmults, Deputy Attorney General of the United States. Also, on March 7, 1983, the Department of Justice issued a "Press Release" defending the government's refusal to comply with this Court's discovery orders.

I find it somewhat surprising that Director Webster and Deputy Attorney General Schmults infer that the Court had not considered all the appropriate elements in the balancing process. Even more surprising was the statement by the Department of Justice that the March 3, 1983 Order compelling disclosure was "unexpectedly entered." The entry of that Order came as no surprise to anyone, particularly the Defendants, counsel for the defense, and the Department of Justice. That issue had been hotly contested from the outset, and had only been partially addressed by the Court in its December Order. When the Court attempted to follow the government's suggestions for *in camera* inspection, the government effectively prevented the fact finding process by first requesting that the Court make the findings only in Chambers and under seal, and then, by proposing that those facts be disclosed *outside of the presence of Plaintiffs or Plaintiffs' counsel.* Those proposals were made by Defendants' trial counsel, who confidently predicted that if the Court followed this *ex parte* procedure, no facts would *ever* be disclosed, since the government argued that it would be able to convince the Court that *any* fact finding would be prejudicial to some informant, somewhere. Yet, perversely, the government refused to disclose to the Court or counsel whether any informant still lived, the death of the informant effectively extinguishing the very limited informant "privilege." *See Roviaro v. United States, supra.* Even without these extraordinary government requests, Plaintiffs continued to argue that they would be extremely prejudiced by facts found by the Court from documents they had never seen.

It was in this unique setting that the Court completed its research, and on March 3 resolved the issue of the limited informant's "privilege," and required Defendant government to produce. The March 3 Order was, then, consistent with the Court's December 29 Order of Production. Between that December date, and March 3,

---

**3.** Defendant either is referring to a March 3 Order Compelling Production or a March 7 Order Imposing Sanctions. There was no March 5 order.

the Court had attempted to comply with Defendant's position on conditions it wanted for production. When those conditions and the repeated modified requests became unworkable and unjust, the Court was required to finally resolve the "privilege" issue. After that resolution, the Court still offered protection to the Defendant in the form of a very restrictive Protective Order requiring an *in camera* view by Plaintiffs' counsel (without Plaintiffs), and by setting a difficult standard for Plaintiffs if they sought to continue their discovery from documents revealed.

It was only when the government refused to comply, of course, that the Court ordered the sanctions. If anything was "unexpected," it was that the government persisted in its prevention of discovery production, while relying on a "privilege". The government never supplied the Court with the condition precedent for invoking such a "privilege", that is, evidence of a *single* live informant. Nevertheless, Director Webster and Deputy Attorney General Schmults concluded in their March 18 submission:

> 10. We further believe that the trial in this case, had it been permitted to proceed, would have demonstrated that neither the United States nor its law enforcement personnel were responsible in any way for injuries Mr. Bergman incurred in this tragic episode. Nonetheless, the commitment to protect the identity of those who assisted our law enforcement personnel in Klan investigations is apparent, and the obligation toward those persons cannot be ignored. In addition, consideration also must be given to the preservation of the informant program, generally, and the impact disclosure of identities would have on the future of that program, as Attorney General Bell eloquently stated. *Thus, our obligation transcends the interests of this particular lawsuit.* (Pages 8–9). (Emphasis supplied).

■ The trial in this case was not permitted to proceed solely because of the flagrant disobedience of the government. The sanctions imposed, precluding the Defend-

ant government from presenting portions of its defense to the federal tort claims and allowing the Plaintiffs to submit proposed findings based upon the undisclosed documentation, were considered to be the most appropriate by this Court because they are the only sanctions which allow a resolution of the issues presented. Any other sanction would "sidestep" the ultimate question presented, resulting in an injustice to both the litigants and the public, six years after suit was commenced. Indeed, contrary to the assertion of Director Webster and Deputy Attorney General Schmults, the obligation of the Federal Bureau of Investigation cannot "transcend" the interests of this lawsuit where that obligation would thwart and denigrate the interests of justice under this nation's system of laws.

Defendants' "suggestion of reconsideration" sets forth the argument that this Court's discovery sanctions should be limited by Magistrate Karr's Report and Proposed Findings of Fact. This contention ignores facts which compelled the Court to order the documents to be disclosed. As is clear from the record, the Court expended time, energy, and patience attempting to arrive at the best approach to the informant problem. Founded in large part upon the realization that the Deputy Attorney General's proposal would work a considerable hardship upon the Plaintiffs, the Court ruled that Plaintiffs' right to a full and complete hearing on their claims dictated that the Defendants produce the requested documents. Defendants' present contention, that this Court should somehow be estopped from issuing any sanctions beyond the Magistrate's Findings of Facts in conjunction with an *in camera* presentation, is supported by neither law nor logic. The process by which Magistrate Karr made his findings demonstrated to the Court the inherent unfairness of the procedure suggested by Defendants. Perhaps realizing this disadvantage to Plaintiffs, Defendants now seek to impose that unfairness upon Plaintiffs by preventing the Court from applying any sanctions beyond the Magistrate's report.

Defendants' suggestion also contains an extensive discussion of the issue of bad faith. As previously set forth, this Court issued sanctions under Fed.R.Civ.P. 37(d) and (b). Inasmuch as there is no requirement of bad faith as a prerequisite to the application of sanctions under Rule 37, it is not altogether apparent to me why such a discussion is necessary. Rule 37(b) is simply founded on a party failing to obey an order of the Court regarding discovery. Defendants' contention that this rule may not be employed under the facts of this case is factually and legally incorrect and is devoid of merit.

Our constitutional system of government works because we want it to—we pay more than lip service to the rule of law. In this case, the FBI has not only argued the propriety of its refusal to disclose, but also wants to sit in judgment upon that refusal, thus ignoring the cornerstone of our system of constitutional government, the separation of powers. The sanctions imposed were necessary to ensure that this concept of government does not become something less than viable and real. The Defendants have requested that I reconsider the imposition of those sanctions. For all of the above reasons, Defendants' Suggestion of Reconsideration is DENIED.

## APPENDIX

### ORAL OPINION AND ORDER OF MARCH 7, 1983

In this Courtroom, during the past week, a lawsuit has been tried which some believe presents issues of historical interest and raises new questions concerning the national government's duty with respect to its citizenry.

Witnesses recalled, sometimes emotionally, events which gave stark testimony to the gaping self-inflicted wounds America was suffering in 1961, and continues to suffer today, in dealing with the awful vestiges of slavery. Man's inhumanity to his brother was never more vivid and distressing than in the witnesses' reflections. The Defendants do not contest that this demonstration of violence by lawless mobs is rep-

rehensible in the extreme. Indeed Plaintiffs, Defendants, their lawyers . . . and the Court were pained by these recollections.

At issue in this lawsuit, however, is the question of whether these Defendants owed a legal duty to Plaintiffs and others, and if so to what extent, to protect them on their peaceful and legal bus ride through the Alabama countryside and into its hate filled cities. Also in debate is the Defendants' responsibility, or lack thereof, to arrest and prosecute the perpetrators of the 1961 violence.

On such important issues, this Court expected, and had a right to expect, a full, complete, and fair presentation of evidence by both sides of the controversy in order to assist me in arriving at a just resolution of the issues. Such fairness and candor were not to prevail, however, as I finally, sadly, learned Saturday.

For, removed from this public trial, another conflict was being waged. Principally at issue in this controversy was whether the Plaintiffs would learn, from the Defendants' own files, what information Defendants had developed about the 1961 events, and additionally, what participation, if any, Defendants, or any of them, had undertaken in support of the planned violence or in the violence itself. Of major concern were the activities of FBI informants, including Rowe, and the Defendants' knowledge, actions, or inactions regarding those informants.

As Defendants succinctly pointed out in their opening statement, hard questions were being submitted to the Court, not the least of which involved our constitutionally proclaimed notions of federalism, and notwithstanding that resolution, any proximate causation attributable to these Defendants.

It was clear that these issues would, for the greater part, have to be resolved by a rigorous examination into documents, disclosed, and undisclosed in the exclusive possession of the United States, a Defendant in this action. As a Defendant, the United States, through its counsel, decided which documents to make available to Plaintiffs

and which to secrete. The Court was petitioned, by Plaintiffs, to require the United States to reveal the withheld materials, and the Court, after careful consideration ordered a limited production. Deputy Attorney General Schmults declined to obey the order, as previously noted by me, and I ordered *in camera* inspection.

Following four full days of exhaustive examination, I ordered additional production to the Court, some of which, albeit tardy, was delivered to this Court's Chambers late last week. On Friday evening, however, I learned to my surprise, that Mr. Sher could not assure me that all of the ordered production had arrived. Indeed, he wasn't even certain that he could make such an assurance by next Tuesday, but "he would try."

During a final pretrial, several Saturdays ago, Plaintiffs' counsel expressed some concern that the Court would make fact findings, from the undisclosed documents, since Plaintiffs would have no opportunity to dispute those findings as they would be derived from documents which they had been denied access to. My preliminary decision to make such findings emanated from the Deputy Attorney General's suggestion, and from limited case law on the subject. The Plaintiffs' expressed concern became mine because, although I had not previously considered it, such a process might, indeed, produce a harsh and unjust result, particularly since Defendants' counsel predicted favorable findings.

In the intervening weeks between pretrial and trial I reflected on the problems presented, and became uncomfortable about another obviously developing spectre—that of having a partly public and partly private and entirely secret trial. While sometimes necessary, such a bifurcation produces public uncertainty, unease, and suspicion, not to mention a complication of the appellate process.

On Sunday, February 27, 1983 I resolved a small portion of the controversy by deciding that the government's claim that the Rowe Task Force Report was privileged because it was a critical self-examination exercise, was clearly inapplicable since, among other reasons, it had been requested by two United States Senators, clearly severing the *self* from *examination*. Consequently, I ordered the production of the same parts of the report which Judge Stewart, in *Peck v. United States,* 514 FSupp 210 (SD NY 1981) ordered. That resolve prompted, in me, a hope—no more—that my proposal to make fact findings would not be unfair to either side.

Such hope was dashed, on Monday, the first day of trial, however, when government counsel added an additional request upon my fact finding; to wit, that it be done under seal and only preliminarily so that the government could have an additional opportunity to convince me that *any* fact found might reveal the identity of an informant. I had told the lawyers that I would carefully excise from my findings any data which could possibly lead to revelation of informants' identities. This did not satisfy the government attorneys, however, nor was that a condition suggested by the Schmults letter in January.

With some trepidation, I decided to comply with said additional request, and announced to the lawyers that I would (1) first make my fact findings, in Chambers, and under seal, and (2) allow trial counsel to consult with Washington, and following this exercise, to re-appear in Chambers to argue how my proposals might jeopardize some, to me, unknown informant. My trepidation stemmed from my growing concern that such a process would: (1) lengthen the trial period; (2) create uncertainty in the fact finding procedure; and, (3) most importantly, continue, in a major fashion, to obscure, from Plaintiffs, important truths.

Trepidation became alarm, by Wednesday, when government counsel proposed yet another condition on its own proposal—that my agreed upon preliminary fact finding be disclosed *only* in the presence of government counsel and *out* of the presence of Plaintiffs' counsel. Now, apparently, it was requested that a curious, to say the least, trial within a trial would be conducted without the presence of one side. While

possibly proposed in good faith, the result was judicially shocking because it was not an *in camera* review that would be monitored by Defendants, but rather the Court's own decision making process.

Such suggestions led me to conclude that I must resolve the still unresolved assertion of the qualified and limited informants privilege. I had indicated my concern about informants from the outset, as noted by Schmults, but I retained reservations about its applicability because, among other reasons, of the ancient nature of the supplied information *and* because the government had refused to even simply divulge whether any informant still lived—the latter concern dissolving any privilege which may have existed. I also began to muse whether the government was really as concerned about informers as it was about shadows of a darker hue. This musing was prompted by the only *in camera* documents which I personally reviewed last Sunday and by the reluctance of the government that I make findings despite Schmults' suggestion. My decision on the limited informant privilege is a matter of record as of last Thursday. Legal research convinced me that it did not pertain, after a careful balancing of interests, to the instant facts.

Having thus resolved the issue, I could have ordered open production by the government, but I did not do so. Caution and concern prompted me to order sealed review by Plaintiffs' counsel under a strict protective order. Caution, because I do not know what the bulk of the material is, and concern because I feared government disobedience might possibly result from unrestricted delivery to Plaintiffs.

On Friday morning Defendants' counsel announced in Chambers its decision to comply with the order provided a seven point protective order be issued by the Court. I ordered Plaintiffs' and Defendants' counsel to meet Friday afternoon and attempt to agree on a proposed protective order. By 6:30 in the early evening I met with counsel again and was pleased to learn of their agreement on the bulk of such an order, but chagrined that they had failed to agree on

two items. In summary Defendants wanted Plaintiffs' counsel to waive any further investigation or their right to other documentation which might be prompted by the soon to be revealed documentation. Plaintiffs argued that they could not be so restricted to material which they had never seen.

After reflection on the new dispute I told the lawyers, on the record, Friday evening that I would so restrict the Plaintiffs' lawyers, but that if the secret material required them to look further, I would entertain a motion to that effect; but that I would not permit further investigation or review unless Plaintiffs made a very strong showing of need—indeed to comfort the government I used the phrase that Plaintiffs had an "overwhelming and substantial burden" and that if they could not meet this burden further discovery would not be permitted. Once again the government lawyers wanted to call Washington and Court adjourned.

On Saturday morning Mr. Sher made the following announcement to the Court and counsel in Chambers:

> After consultation with Washington, we have been instructed by the Deputy Attorney General of the United States that in view of the fact that, that we cannot be certain that disclosure will be limited to the, if we can use the phrase, group of seventeen, we cannot comply with any disclosure order with regard to informant's material.

In view of the government's disobedience, I am today confronted with the problem of how this trial may fairly proceed. I was totally unprepared for the newest refusal, although on reflection, perhaps I should have been. Although not entirely precedential, the government, for the most part obeys lawful Court orders; witness the chief executive of the second branch of our government, President Nixon, obeying a District Court production order regarding White House tape recordings. Indeed the doctrine of separation of powers dictated that result reached in *United States v Nixon,* 418 US 683, 94 SCt 3090, 41 LEd2d 1039

(1974); the same doctrine requires production in *Bergman v United States.*

Our constitutional system of government works because we want it to. We pay more than lip service to the rule of law as it has come to be known. After all Judge John J. Sirica did not command a vast army or any army at all. He had to count on the executive branch, after he adversely ruled on the government's assertion of executive privilege, to voluntarily comply with his mandate.

I often employ this example in speaking to juries as an illustration of our judicial and constitutional system. I fear, given the publicity of the government's refusal, that I may never again be able to so instruct a jury. That all parties are expected to comply with a Court order is unquestioned. That the government is no different from a private citizen is also without serious debate. When the government is also the Defendant in a lawsuit, such refusal must be viewed with alarm. The chilling effect on a citizen's right to challenge official activity is all too apparent.

Who will win this lawsuit is, today, unknown to me and hence to all. What is known, sadly, is that the remaining portions of this trial may be conducted unfairly, unless I address the government's position properly, since one side remains, in part, ignorant about official and critical documents. The saddest thing we know, however, is who the real loser is—the American public—which public has a right to expect compliance with a Court order—so that we may continue to function as a republic controlled by law and not by the powerful.

And so it has been a lonely and unpleasant weekend for me. That I cannot ignore the government's disobedience is conceded by government counsel. To endorse such conduct indeed, would be to approve lawlessness and be reprehensible as it would not, among other reasons, command respect for the American judicial system and deter future disobedience.

In considering, over the course of this weekend, what sanctions to impose I, therefore, looked to several of the documents which have been provided to the Plaintiffs and are, either in evidence or stipulated to by the parties that they may be placed in evidence. My reasons for doing so were to see if I could determine: (1) what Plaintiffs already know, and; (2) what prompts them to want to see more, so that I could try to interpret and predict the importance of the undisclosed material to the issues in the case at bar.

I found a memorandum dated May 15, 1961 authored by FBI Director J. Edgar Hoover and addressed to Attorney General Robert F. Kennedy which reads in pertinent part:

\* \* \* \* \* \*

Our Birmingham Office notified the Anniston, Alabama, Police Department on May 13, 1961, that the subject group would be in Anniston on May 14, 1961, for a fifteen minutes' stop, and a group of klansmen planned to prevent the individuals from using the facilities of the bus station at Anniston. (Plaintiffs' Exhibit 72.)

Equally as critical is a June 1, 1961 letter composed by Attorney General Kennedy and directed to Congressman Huddleston. That letter is set forth in its entirety below:

Honorable George Huddleston, Jr.

House of Representatives

Washington 25, D.C.

Dear Congressman:

Our actions in the recent incidents in Alabama were set forth in detail in telegraphs to Governor Patterson and members of the Alabama delegation in the Congress, copies of which were sent to you.

Our responsibility was quite clear—to maintain the safety of interstate bus transportation when the local authorities proved unwilling or unable to do so. This is what we did—nothing more and nothing less.

With best wishes,

Sincerely,

Attorney General

RFK:EG:dj

cc: Files

(Plaintiffs' Exhibit 170.)

The above quoted letter clearly speaks to a duty on the part of the government. Edward R. Murrow once asked: "Who speaks for Birmingham"—I ask who speaks for the United States? The duty position of Attorney General Kennedy, immediately following the incident, or that of trial counsel 22 years later? I note that (now) Justice Byron White (then Deputy Attorney General), in his trial deposition, agrees with Robert Kennedy's view of the FBI's duty with respect to the Freedom Riders. The letter also relates that the government met that duty. Unfortunately, for all of us, the evidence produced in this case contradicts the Attorney General's last sentence.

I am satisfied by this brief review of the apparent importance of this material to the Plaintiffs and to the cause of fairness and justice. Having proffered evidence which is satisfactory to the Court to establish portions of a right to relief, I can only infer that the undisclosed and secret documentation is even more critical and important than I, at first, postulated. What lies undisclosed and secret must, therefore, be made known to Plaintiffs so that like any other party in any other lawsuit, they may fairly and adequately present their claims. But it will not be known, and they, and the public, and all of us, are to be deprived of the whole truth.

The government's disobedience imposes on the Court an obligation to right the wrong, and the resolution I am about to order will essentially conclude presentation of evidence on these contested issues. Quite possibly the government will be satisfied by such a result because its refusal to disclose obfuscates, to a degree at least, the truth and so I will seek to present as much truth as is possible under the circumstances.

During my weekend reflections, I wondered why the Justice Department would not wish—after all it suggested critical self-evaluation as a defense to disclosure earlier—to make a complete revelation since Judge Webster's FBI is obviously not Hoover's and since 22 years have passed. It occurred to me that Kemp and Jenkins may have been poorly represented in this secrecy matter, since if they had independent counsel, they may well have made the same disclosure demands the Plaintiffs have made. It has also occurred to me that today's rank and file FBI agents and personnel have been slighted and may well desire the government to defend this case on the merits rather than having the government invoke the cloak of secrecy.

What might be the shadows of a darker hue to which I earlier alluded? Since I haven't read the great bulk of the material, I cannot know, but my brief review last Sunday of the admitted evidence reminds me of Norman Couzens' warning:

THE GOVERNMENT CRIES OUT that its secrecy has been violated. Of what stuff does this secrecy consist? Not infrequently it consists of malcalculations, errors of historic proportions and attempts to conceal them, and plans and manipulations that run counter to constitutional government and that reflect contempt for free institutions. The fact that such materials have been classified as "Secret" is understandable in terms of the threat to the personal security of the men who made the errors and did the classifying. But it is not tolerable to the American people, whose security is tied to clearly defined constitutional safeguards.

These constitutional safeguards persuade me that citing certain parties for contempt will simply serve to create a public spectacle pitting the Court and the Justice Department on opposite sides of the controversy ... while not aiding the causes here joined. Also, I am persuaded, by the events of the last months, that such an order of incarceration or fine would not shed any light whatsoever upon the hidden documents. And so I turn to the kinds of sanctions most appropriate in view of the events that have led to this impasse.

Federal Rule of Civil Procedure 37(b), invoked here pursuant to subsection (d) of that rule, describes the kinds of action a court may take in response to a party's noncompliance with discovery. The rule

gives the Court discretion to "make such orders with regard to the failure as are just," and provides for sanctions of varying degrees of severity. Specifically, the Court may impose costs, make findings of fact against the offending party, and prohibit defenses; a Court may also enter a default judgment under this rule. Underlying these sanctions is a threefold purpose, which has been described by the Second Circuit in *Cine Forty-Second St. Theatre v Allied Artists,* 602 F2d 1062, at 1066 ( [2nd Cir.] 1979) (citations omitted):

> Preclusionary orders ensure that a party will not be able to profit from its own failure to comply.... Rule 37 strictures are also specific deterrents and, like civil contempt, they seek to secure compliance with the particular order at hand.... Finally, although the most drastic sanctions may not be imposed as "mere penalties," ..., courts are free to consider the general deterrent effect their orders may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault.

Of course, the most satisfactory role of the sanction is that of obtaining compliance with the Court's order, since such a result "cures" the problem and allows the Court to resolve the matter on the merits after full disclosure of the facts. However, as I have noted above, the government has made it clear that such compliance is not a realistic expectation in this case. Instead, the pervasive effect of the government's non-disclosure in this case requires strong measures in order to meet the remaining objectives of Rule 37.

Other courts, under similar circumstances, have also found the need to invoke severe sanctions against the government. In *Reynolds v United States,* 192 F 2d 987 (CA3 1951), *rev'd on other grounds,* 345 US 1 [73 S.Ct. 528, 97 L.Ed. 727] (1953), the government had refused to turn over records from the Air Force's official investigation of an air crash in which plaintiffs' civilian husbands had been killed, claiming that the documents contained military secrets. The records were critical to plain-

tiffs' negligence claim under the Federal Tort Claims Act, and when compliance with the court's *in camera* production order was not forthcoming, the court ordered sanctions under Rule 37. Invoking what is now 37(b)(2)(A) and (b)(2)(B), the court ordered that the negligence of the government would be taken as established and that the government would not be allowed to controvert that fact. A hearing was then held on the issue of damages and a judgment entered in favor of the plaintiffs. These sanctions were upheld by the Third Circuit on appeal.

Similar sanctions were invoked more recently in *Kahn v Secretary of HEW,* 53 FRD 241 (D Mass 1971). In that action under the Civil Rights Act, 42 USC § 1983, plaintiff charged that the government had denied him a position with the Public Health Service on arbitrary or discriminatory grounds. Plaintiff had been advised by letter that he was rejected because he was not fully qualified; the government later conceded plaintiff's qualifications in its answer to plaintiff's complaint, but refused to disclose the basis to its decision. Specifically, the government refused to produce its loyalty and security evaluation of plaintiff *in camera,* claiming the documents were "classified." The court imposed 37(b)(2) sanctions, on the grounds that defendant was in bad faith trying to deny plaintiff a fair determination of his claim, and that the documents were critical to plaintiff's case. Based on some evidence available to the court from the record, the court made findings that a security investigation of plaintiff had disclosed a publicly asserted opposition to the Vietnam war. On plaintiff's motion for summary judgment after sanctions were imposed, the court held that such activity was protected by the First Amendment and that judgment should be entered for plaintiff.

The government was likewise precluded on fact issues in *United States v Sumitomo Marine & Fire Insurance Company,* 617 F 2d 1365 (CA9 1980). In that case, the government had repeatedly and over a period of time avoided compliance with the

court's discovery orders. Upholding the trial court's imposition of sanctions, the Court of Appeals noted that "the effectiveness of and need for harsh measures is particularly evident when the disobedient party is the government," in light of the goal of general deterrence and notions of public interest. *Id.* at 1370.

I find that there is ample authority for my decision to impose severe sanctions against the government in this case, much as the sanctions were applied in the cases discussed above. That Plaintiffs are prejudiced by the non-disclosure is obvious, not only in the sense that they are deprived of access to specific facts central to their claims, but because Plaintiffs are deprived of even the knowledge of the scope and nature of the undisclosed information. Such forced ignorance can only pervade the entire proceeding, to Plaintiffs' detriment. It is the Court's task to now apply sanctions in such a way as to preclude the government from benefiting by its course of action, fulfill the goal of general deterrence of such conduct in the future, and to ensure that fairness is not violated.

Pursuant to Rule 37(b)(2)(B) and in light of the problems caused by the refusal to produce documents, the government must be foreclosed from controverting Plaintiffs' evidence or proceeding with its defense, on all but statute of limitations grounds. I reached this conclusion only after searching for some way in which I might be able to ensure that the matter could proceed fairly. I find that all avenues are blocked by the effect of the government's conduct. Because the content of the documents is unknown to Plaintiffs, they cannot know what evidence introduced by the government comes from the undisclosed records. They cannot know of areas of potential cross-examination or rebuttal. The Court is in no better position, since I too am unaware of the contents of the documents. I cannot know if the government's evidence is limited to matters outside the realm of those secret materials. In fact, I cannot imagine that the documents would *not* be implicated at some point. Nor can I adequately remedy the problem by myself delving into the

undisclosed materials *in camera.* If I tried to make *in camera* findings based on the content of the materials I would be invoking the *ex parte* procedures Defendants originally sought, with all the attendant unfairness which I have considered throughout this discovery issue.

I cannot allow the government to benefit by its conduct. Nor am I willing to take on the role of advocate on behalf of the Plaintiffs by sifting through documents and making selective fact findings. On the other hand, outright disclosure of the documents, while physically possible because they remain in the Court's possession, would violate the Court's position as a kind of "trustee" of the papers. This kind of self-help remedy would also go against this Court's stated concern for the informants who may be harmed by such full and public disclosure. My review of the "secret" documents would leave other problems unsolved, even if I were not to make fact findings from their contents. How could I use the information gained by my review, to referee the remainder of the trial in an effort to exclude reference to facts in the documents or to prevent Defendants from going into areas where the documents might be of use to Plaintiffs? The scope of the task alone is overwhelming. In addition I would again have to act as Plaintiffs' advocate rather than as an impartial arbiter. And I would inadvertently disclose the contents of the documents by my rulings. I would encounter all of the problems I have discussed in previous rulings, of separating the "secret" from the "open," in my mind and in my written opinion. I can only conclude that the defense on the merits of Plaintiffs' case cannot proceed.

As I noted, imposition of this sanction does not extend to the question of the statute of limitations, and the government—and Plaintiffs—may proceed on that issue.

While foreclosing the government's defense on the merits furthers the Court's objectives in imposing sanctions, it is not a complete remedy. The prejudice to Plaintiffs goes beyond affecting their ability to

rebut the government's defense since it also affects the ability of Plaintiffs to present their claims in the fullest light. The unknown documents may contain facts which are critical as well as corroborative of Plaintiffs' claims. Plaintiffs will never know. For this reason, I also impose a fact finding sanction pursuant to 37(b)(2)(A). I will review the evidence submitted by Plaintiffs to date, in the form of testimony and documents, and make appropriate fact findings in accordance with Plaintiffs' claims. I will presume that the undisclosed documents contain facts which corroborate Plaintiffs' evidence, and to the extent necessary I will make findings of fact based on the presumption that further evidence in favor of Plaintiffs would also have been disclosed. In order to do this, I order the Plaintiffs to submit to the Court within 10 days a list of proposed facts which they believe could have been shown had they had access to the undisclosed documents. While Plaintiffs must necessarily resort to some speculation in order to accomplish this task, I have noted above that there is some evidence in the record already which gives credence to the suspicions the Plaintiffs entertain with regard to the undisclosed information. To the extent possible, Plaintiffs should make reference to the basis for their proposed findings.

After review of all of this material, I will issue an opinion on liability. If I conclude that liability on the part of the government is appropriate, a hearing on damages will follow. If no liability is found, the matter will be concluded with a judgment. I am not unaware of Rule 55(e), which precludes a court from entering a default judgment against the United States under some circumstances. But my review of the law convinces me that this ruling does not run afoul of that provision.

I am concerned about what to do with the individual Defendants. As noted above, the imposition of sanctions against the United States raises a very serious question as to whether the same, or any, sanctions can and should be imposed upon Defendants Kemp and Jenkins. This issue is complicated by several considerations. First, because Rule 37(b) relates solely to situations in which the Court has made an order to provide or permit discovery and a party has failed to obey it, the Court must take into account the fact that both Kemp and Jenkins were ordered, along with the other Defendants, to produce the documents at issue. Thus, it appears at first blush that both Jenkins and Kemp would come within the plain language of Rule 37(b) as disobedient parties. However, such a conclusion ignores the fact that apparently neither Kemp nor Jenkins had access to or control over the documents which the government has refused to tender. This apparent inability on the part of the named individual Defendants would seem to militate against the imposition of sanctions, at least at this juncture.

A second complicating factor relates to the fact that Kemp and Jenkins are both being represented in this litigation by R. Joseph Sher, the same attorney who is representing the government. While that arrangement does raise some potential conflicts the most disturbing aspect of it for present purposes relates to Mr. Sher having the unfair advantage of knowing the contents of those documents which the government has declined to permit the Plaintiffs to discover. This is a problem for the Court because it offends the Court's sense of justice to permit the individual Defendants to reap the benefit of the government's disobedience. If Kemp and Jenkins are not subjected to the same sanctions as is the government, then they would be able to defend this lawsuit while using information their attorney obtained as counsel to the government and which information was kept from the Plaintiffs in violation of this Court's order. Such an anomalous result does not appear to be in keeping with the ideal of fairness to all parties. (Upon motion, the Court granted a mistrial as to these two individual Defendants).

## ORDER

This matter having come before the Court on Defendants' Suggestion of Reconsideration of this Court's Order of March 7,

1983; the parties having submitted written arguments thereon; and the Court being fully advised in the premises,

IT IS HEREBY ORDERED that Defendants' Suggestion for Reconsideration be, and the same is, DENIED.

## OPINION ON LIABILITY

We have sought to be helpful to avert violence and to get voluntary compliance. When our investigations indicate there has been a violation of law, we have asked responsible officials to take steps themselves to correct the situation. In some instances this has happened. When it has not, we have had to take legal action.

 * * * * * *

You may ask: Will we enforce the civil rights statutes?
The answer is: Yes, we will.

 * * * * * *

We will not threaten, we will try to help. We will not persecute, we will prosecute. We will not make or interpret the laws. We shall enforce them vigorously, without regional bias or political slant. All this we intend to do.... (Excerpted from the text of Attorney General Robert F. Kennedy's address at Law Day exercises at the University of Georgia Law School on May 6, 1961; reported at page 62 of the May 7, 1961 edition of the New York Times).

Law Day was ordained several years ago in the United States as a special day on which this country might pay homage to the rule of law, and recognize its central importance in this free republic. Over the years since its inception, however, critics have argued that Law Day has become simply another "patriotic" day in which Law Day speakers are expected to utter banalities before bored school audiences or in the presence of equally restive local and state bar associations. The ultimate issue in this lawsuit raises the very question inherent in that criticism: Was Robert Kennedy, in his Georgia oration, expressing the administration's view of what the law

ought, some day, to provide; or was he explaining to this nation the state of the existing law, and the administration's determination to enforce it?

As this nation's chief law enforcement officer, Attorney General Kennedy used, in his address, the words: "*we* have had to take legal action;" "*we* will *prosecute;*" "*we* shall *enforce* them (civil rights statutes) *vigorously*...." (Emphasis supplied). The "we" presumably refers to the United States, which he represented, through its agencies: the Department of Justice, the Federal Bureau of Investigation (FBI), etc. Defendant United States, however, in the instant litigation argues that the FBI, at least, had no legal duty to enforce, to arrest, or to prosecute; Plaintiffs maintain that it did, and thus, this paramount issue has been joined.

Ironically, Attorney General Kennedy addressed the Georgia Law School graduates a mere eight days before Mother's Day 1961, and it was on that quite different celebration date that the deplorable violence occurred which Plaintiffs urge produced the legal wrongs which they seek here to redress. On that date the world was, once again, reminded of the dreadful consequences which this nation suffered as a result of its institution of human slavery. That the Thirteenth Amendment did not bring justice to American black citizens has been dramatically set forth by Gunnar Myrdal in "An American Dilemma," by Charles E. Silberman in "Crisis in Black and White," and by scores of others. What happened in Alabama in May of 1961 provides stark evidence of this racial conflict manifested by the awful violence perpetrated by ignorant and angry white citizens against an admittedly peaceful racially mixed group seeking no more than simple justice. Defendants do not condone the actions of the Anniston and Birmingham mobs, but they do deny the existence of any legal duty with regard to preventing the violence, arresting and punishing the perpetrators, and consequently, of protecting the Bergmans and their fellow Freedom Riders. The ultimate issue, then, requires a resolu-

tion of the duty of the federal government to these Plaintiffs, under the Federal Tort Claims Act.

### The Lawsuit

This civil action was filed by Plaintiffs on January 4, 1977 against several named and unnamed FBI agents, in their individual and official capacities; and against the United States government, seeking damages and declaratory relief for alleged violation of Plaintiffs' rights arising under the First, Fourth, Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution, under Title 42 of the United States Code, §§ 1983, 1985(3) and 1986, and under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674. The issue of liability was bifurcated from that of damages upon the request of all parties and the case went to trial solely upon the issue of liability on February 28, 1983.

Because of discovery problems, the Court was forced to issue sanctions against the government. The sanctions effectively ended the trial on liability, after the presentation of Plaintiffs' case, and after exhibits were accepted into evidence from both sides. To avoid unfair prejudice against Defendants Kemp and Jenkins as a result of the government's conduct, a Motion for Mistrial was granted as to those Defendants following the Court's decision on sanctions.[1]

Although under the Court's sanctions Plaintiffs were allowed to submit proposed fact findings which they claimed might have been made given the full disclosure of documents by the government, the factual conclusions which follow are not based on such submissions. Rather, the facts found here are drawn from the testimony of witnesses for the Plaintiffs, who were subjected to cross-examination by the Defendants, and from the hundreds of exhibits received in evidence.[2] In this way, the Court has been able to resolve this matter without applying the full extent of the sanctions which had been ordered.

Having thus been tried before the Court, sitting without a jury, and having considered the pleadings, testimony of the witnesses, and documents offered in evidence, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### The Incident

In the broadest perspective, the facts of the Mother's Day incidents are absolutely devoid of any contest. The sole factual dispute, if indeed there is any dispute, involves the action or inaction of certain FBI agents, the Bureau itself, and the Justice Department.

The case arises from incidents which occurred in the Freedom Rides in 1961. Following a Supreme Court Opinion requiring the desegregation of public facilities involved in interstate commerce, the Congress for Racial Equality (CORE) decided to see "how far south the law applied" (Testimony of Plaintiff Walter Bergman). In the Spring of that year CORE devised a plan to send buses of Freedom Riders through several southern states, including Alabama, for the purpose of challenging, by non-violent methods, segregation of the races in public facilities which served persons traveling in interstate commerce. This challenge was to be carried out by a racially mixed group of Freedom Riders who would ride interstate

---

**1.** The sanctions, and the events leading up to their imposition are discussed in my Opinion of May 24, 1983. *Bergman v. United States,* 565 F.Supp. 1353 (WD Mich.1983).

**2.** Despite the sanctions, I received into evidence and considered all of the documents and other exhibits offered by both parties. This is significant in that the documents submitted framed the major portion of the controversy, as evidenced by statements of counsel for both parties during conferences with the Court that this lawsuit is essentially "a paper case." Defendant United States was also permitted to cross designate those depositions offered by Plaintiffs. In this manner the Court received the deposition testimony of Defendants Jenkins and Kemp, who testified in the related case of *Peck v. United States,* which is pending in the Southern District of New York, before the Honorable Charles E. Stewart.

bus systems (Greyhound and Trailways) in an integrated fashion—white citizens sitting together with black citizens at the front of the bus, and not in the back as was then the custom. At the terminal, one white and one black would seek restaurant service, and would integrate waiting rooms, restrooms, and other facilities.

Among those who participated in the Freedom Rides were: James Farmer, Rev. E. Elton Cox, Albert Bigelow, Dr. Walter Bergman, Frances Bergman, Edward Blankenhaim, Genevieve Hughs, John R. Lewis, James McDonald, Henry Thomas, James Peck, Joseph Perkins Jr., Charles Person, Herman K. Harris, Isaac Reynolds and Ivor Moore, several of whom testified in this case.

Other individuals involved in the subject matter of this litigation include Thomas J. Jenkins, who was an employee of the Federal Bureau of Investigation from August 19, 1934 through August 26, 1976. From November 1960 through December 1961, Jenkins was the Special Agent in Charge (SAC) of the Birmingham, Alabama field office of the FBI. In addition, Barrett G. Kemp was a Special Agent (SA) of the Federal Bureau of Investigation from August or September, 1959 through the end of May or first part of June 1961. Kemp recruited Gary Thomas Rowe, Jr. as an FBI informant in May 1960 and remained Rowe's contact agent until Kemp left the FBI. Rowe continued to be an informant for the FBI for approximately four years following the incident of May 14, 1961, and at least until the Liuzzo murder on the Selma road in 1965.

### The Situation in Birmingham
### Before Mother's Day

A powerful force in the City of Birmingham in 1961 was Police Commissioner Eugene "Bull" Connor. Connor, a strident segregationist, was actively involved in a local mayoral election at the time the Freedom Riders were scheduled to arrive in Birmingham. Two candidates were running for the position of mayor: Thomas King, who was viewed as a moderate, and was associated in a law partnership with Charles Morgan, a civil rights attorney; and Arthur Haynes, who was a staunch segregationist, and who was supported by Connor and elements of the Ku Klux Klan (KKK).

King had previously won an early primary race and it appeared to observers that the ensuing election would be close. Thus, it was to the advantage of the segregationists' candidate, Haynes, to further inject the element of race into the election by inciting racial tension in the city prior to the election. To this end and presumably from Connors' office in City Hall, King was photographed shaking hands with a black man and the photograph was published in the local newspaper in an attempt to bring the racial issue to the forefront.[3]

Charles Morgan, a witness at trial and the law partner of King, testified about the political realities surrounding the anticipated arrival of the Freedom Riders. As a person very active in the King campaign, Morgan was anxious that the Freedom Riders not be in Birmingham until after the election, since he was concerned that the presence of this racially mixed group in Birmingham would result in arrests and subsequent headlines producing an unwanted effect on King's campaign. On the other hand, it was clear that Connor welcomed the arrival of the Freedom Riders because the issue of segregation could be dramatized and could strike an emotional chord in the local electors, thereby encouraging them to support Connor's candidate. This, then, was a political opportunity for Connor to further his own position in the Birmingham city government, as well as to advance the cause of segregation. Into this maelstrom of political demagoguery the Freedom Riders journeyed.

---

**3.** Morgan testified at trial that King had been invited to City Hall by Connor to discuss the campaign, and as King left he was "surprised" by a black man who appeared "out of nowhere," offering his hand to King. King was unaware of the hidden photographer.

*The Freedom Ride: Advance Knowledge*

On April 24, 1961 CORE publicly announced plans for the Freedom Ride, including the identities of the participants and the precise itinerary, announcing the fact that the Freedom Riders would arrive in Birmingham on May 14. This information was transmitted that same day from the Director of the Federal Bureau of Investigation to numerous FBI field offices, including Birmingham. By this transmission all field offices were directed to alert local authorities, and in response to these instructions from Headquarters, SAC Jenkins informed Birmingham Police Chief Jamie Moore of CORE's plans on April 24. Likewise, on May 1, the FBI furnished W.S. Weatherly, Police Commissioner in Anniston, with the details of the Freedom Ride plans.

The specific itinerary of the Freedom Riders was again transmitted from Bureau headquarters in Washington to Birmingham on May 5, and SAC Jenkins of the Birmingham field office relayed this information to Chief Moore on May 8. On May 5, James Farmer, National Director of CORE, informed President Kennedy, other top government officials, and the Presidents of Greyhound and Trailways of the itinerary for the Freedom Ride. This information was published in The Louisiana Weekly on May 6, 1961:

> President Kennedy was told that "freedom ride" is an appeal to the best in all Americans. ["]We travel peaceably to persuade them that Jim Crow betrays democracy. It degrades democracy at home. It debases democracy abroad . . . we feel it is our duty to affirm our principles by asserting our rights." (Defendants' Exhibit 72).

*The Freedom Ride: Greensborough to Atlanta*

On May 7, 1961 the Freedom Riders arrived in Greensborough, North Carolina without incident, and the next day traveled to Charlotte, North Carolina where Joseph Perkins, Jr., a Freedom Rider, was arrested after being refused a shoeshine at the bus terminal. This information was sent to the Birmingham field office by the FBI, and on May 11 SAC Jenkins passed the information on to Birmingham Police Chief Moore. In addition, the information was transmitted to the Civil Rights Division of the Department of Justice on May 12.

The next stop on the Freedom Ride was Rockhill, South Carolina on the afternoon of May 9, 1961. One or two Freedom Riders were struck by a white man, but no charges were pressed. This information was forwarded to the Birmingham field office, and Chief Moore was advised of it on May 11.

On May 10 the Freedom Riders arrived at the Winnsboro, South Carolina bus terminal where Henry Thomas was arrested for trespassing because he sought service at a lunch counter. Again this information was passed on to the Birmingham field office. Three days later the Freedom Riders arrived in Atlanta, Georgia without incident, and the Birmingham field office of the FBI was so advised. That office subsequently notified Chief Moore of this information on May 13.

*The Freedom Ride: Greyhound Bus, After Atlanta*

On the morning of May 14, 1961, Mother's Day, two groups of Freedom Riders left Atlanta, one from the Greyhound bus station, and one from the Trailways bus station, the Greyhound bus leaving first. The Birmingham field office of the FBI was informed that the Freedom Riders had left Atlanta, and the FBI advised the Birmingham Police Department of this fact.

This first bus arrived in Anniston at approximately 3:30 p.m. and was immediately met by an angry mob, wielding clubs and chains. Even though the bus was the subject of some attacks by the crowd and a tire was slashed, it managed to leave Anniston under its own power after the local police cleared a path for the bus to pull out of the station and return to the highway. The police escorted the bus to the Anniston city limits, then abandoned their escort, leaving the bus to slowly limp down the road. In

front of the bus, two slow moving vehicles repeatedly hindered the bus' progress. Closely following was a procession of vehicles, whose occupants were acting in a threatening manner. Approximately three to five miles outside of Anniston the bus driver stopped to repair the rapidly deflating tire. An angry group of people soon appeared and someone slashed another tire on the bus, rendering it helpless. During this time, Alabama state investigator Ell Cowling stood in the doorway of the bus, acting as a shield between the mob and the Freedom Riders.[4]

After approximately ten minutes someone from the assemblage threw an incendiary bomb through a window of the bus, and for a brief period the mob outside attempted to hold the doors of the bus shut in an effort to "roast the Freedom Riders." Fearing that the bus might explode, the attackers moved away and the passengers were able to disembark.

A photograph submitted into evidence reveals other highway patrolmen in the vicinity of the burning bus. One of these patrolmen assisted Corporal Cowling in preventing physical mayhem from being inflicted on the Freedom Riders after they left the bus, although one Freedom Rider was struck on the head by a club. Not until a shot was fired in the air did the thugs disperse. No investigation of the criminal activity which took place was conducted by the police at the scene, nor were any arrests made. Indeed, even after a "cooling down" period the state officers did not inquire about or document the identity of a single member of the crowd, nor did they write down the license numbers of the parked vehicles. While the officers clearly prevented further violence to the Freedom Riders, they showed little interest in arresting anyone, or in investigating the felonies they had personally witnessed.

The Freedom Riders were then taken to a local hospital where they were met with considerable resistance from the hospital staff and where, outside the hospital, they again were surrounded by an angry and vicious mob. Eventually the Reverend Fred Shuttlesworth arrived with considerable manpower and escorted the traumatized Greyhound Freedom Riders to Birmingham, which they reached in the early morning hours of May 15.

### The Freedom Ride: Trailways Bus, After Atlanta

Approximately one hour after the Greyhound bus left Atlanta, the Trailways bus pulled away from the Atlanta terminal. While standing in line to board the bus, the Freedom Riders had noticed certain white members of the crowd whispering among themselves, approaching other white patrons who were standing in line for tickets, and speaking to them quietly. Many of the patrons then left the line and did not get on the bus. In fact, there were far fewer people aboard the bus when it pulled out of the terminal in Atlanta than usually traveled on the Freedom Riders' buses. Plaintiffs were accompanied by six other Freedom Riders on the bus: Charles Person, James McDonald, Isaac Reynolds, Ivor Moore, Herman K. Harris and James Peck. In addition to these patrons, seven to nine white males, varying in age from 20 to 35, were aboard; they appeared to Dr. Bergman to be quite burly, and hostile. A few other passengers also made the trip from Atlanta to Anniston. During the trip a number of threatening remarks were directed at the Freedom Riders; the Riders were told, for example, "you niggers will be taken care of once you get in Alabama."

This bus arrived in Anniston shortly after the Greyhound bus had been firebombed. As with the Greyhound, the Trailways bus was met and surrounded by an angry mass of people wielding clubs, bats and chains. Distinctive among these weapons, and apparently uniform in size and shape, were small baseball bats. (This same type of bat was seen when the Freedom Riders arrived

---

**4.** The Riders were confused as to Cowling's identity. One witness testified that the FBI subsequently advised him that Cowling was an FBI agent. Other testimony indicated that one or more of the Freedom Riders had been told Cowling was a Greyhound official.

in Birmingham later that day.) The driver got off the bus and took a phone call. When he returned, he announced that the Greyhound bus had been burned along the highway; that from then on he could not guarantee the safety of the passengers if they did not segregate themselves in their seating arrangements; and that if they did not segregate themselves, he would not proceed to Birmingham. One or more police officers boarded the bus at this time. At least one witness testified that a man in civilian clothes claimed to be an FBI agent. They also told the Freedom Riders that the other bus had been under attack. At that point, the other white passengers on the bus demanded that the Freedom Riders segregate themselves according to race. The police officials then left the bus, and even though uniformed highway patrolmen could be seen through the windows of the bus, the passengers began to attack the Freedom Riders.

Charles Person, who was seated at the front of the bus, was the first Freedom Rider attacked. The white passengers on the bus, as well as other vigilantes who began to board the bus armed with brass knuckles and clubs, beat Person repeatedly and threw him to the floor. James Peck came forward to help Person and was likewise beaten down. Then Dr. Bergman, in an attempt to intercede and ask for peace, came forward. The attackers pulled his shirt over his head and began to hit him. Bergman did not attempt to strike back at his assailants, but it took "something" to beat him down to the floor of the bus. The mob then beat and stomped Bergman repeatedly about his face, head, shoulders and back. At this point, Bergman lost consciousness. Meanwhile, Mrs. Bergman helplessly watched the brutal attack upon her husband, trying to protect him by vainly calling out for police assistance.

All of the Freedom Riders, with the exception of Mrs. Bergman, were beaten to some extent and eventually thrown to the back of the bus. According to the witnesses, Bergman was literally "picked up and thrown over the seats of the bus" into the back.

Immediately following the beating, the Freedom Riders noticed several Anniston police officers near the bus. No law enforcement officer made any effort to prevent the beatings, which were clearly visible and audible. Only after the beatings stopped did an Anniston policeman step into the doorway of the bus and say to the Freedom Riders, "I didn't see anything, I can't prove nothing, anyone want to swear out a warrant?" Bergman was bleeding profusely and Peck was covered with blood. One witness described Peck as looking like someone had attempted to slaughter a pig —badly.

When the policeman left the bus, a vigilante stepped back on and took over the front of the bus. Others joined him. He let it be known that Freedom Riders could not sit in front of the bus and that the bus "would reach Birmingham." One of the Freedom Riders tried to go forward to the front of the bus but was ordered to remain in the rear. The bus left for Birmingham, the Freedom Riders tending to their wounds while the leaders of the attackers sat in the front brandishing their clubs and Coke bottles, and making threatening remarks about what misfortunes awaited the Freedom Riders in Birmingham. Adding to the threat of a subsequent attack were several cars and trucks of people brandishing weapons, following the bus all the way into Birmingham.

Once there the Freedom Riders were greeted by what appeared to be a highly organized group of Alabama Klansmen and vigilantes. According to Howard K. Smith, a national news broadcaster, this group had been waiting at the Greyhound bus terminal all day. Smith was in Birmingham assisting Edward R. Murrow with a documentary entitled "Who Speaks for Birmingham?" which was being prepared in response to an article Harrison Salisbury had written for the New York Times. Salisbury had maintained in his article that there were no civil rights for blacks or dissenters in that city. The day before, May 13, Smith, was telephoned by a man

named "Fields," later identified as a Dr. Edward R. Fields, the head of the National States Rights Party. Fields told Smith if he wanted to see "some action" he should be at the bus station the next day.

Thus, Smith waited on May 14 at the Greyhound terminal for the Freedom Riders' buses to arrive. Forty or fifty young and some middle-aged white individuals, who appeared to be big and strong, were milling about the terminal. A large man in a suit, with a white carnation in his lapel, appeared to orchestrate the actions of this group and, at one point in time, directed the mob to immediately proceed to the Trailways terminal. Curiously, Smith noticed that all visible signs of a police presence had disappeared. Indeed, he had observed police cars and policemen leave the streets and return to the police station, which was located in City Hall, across the street from the Greyhound depot. Even the traffic officer stationed at a busy local intersection was absent for a period of time before the arrival of the bus. In short, there was no police presence visible in that part of the City of Birmingham to protect the Freedom Riders.

Smith followed the throng to the Trailways bus terminal, arriving just as the bus from Anniston pulled into the station. The two people who were selected by the Freedom Riders to "test" segregation policies at the Birmingham Trailways station were Peck and Person, both of whom had been severely beaten in Anniston. These men stepped out of the bus and, unprotected by any police presence, were severely and brutally beaten once again. The crowd was armed with short lengths of pipe concealed in brown paper bags, and with the same short baseball bats observed and used in Anniston. Undisputed testimony reveals that in this scene Dr. Bergman was pushed.

Smith noticed that the man with the white carnation had given a signal to the milling Klansmen that the Freedom Riders should be beaten. From his vantage point across the street, Smith observed a further signal being given approximately 10 to 15 minutes after the attack began. The mob then dispersed into cars, which had their engines running and drivers waiting. At this point the Birmingham police finally reappeared on the streets of Birmingham, and the Freedom Riders, bloody and beaten, made their way to the friendly confines of the Rev. Shuttlesworth's church to seek medical attention.

### The FBI and Gary Thomas Rowe

As early as the Spring of 1960, and probably far earlier, the FBI had begun a program to recruit informants to infiltrate the KKK. Through such infiltration, the government could discover KKK plans for future activities.

Clarence Kelley, now retired from his position as Director of the FBI, and dismissed as a Defendant in this action, was Special Agent in Charge of the Birmingham office in 1960, until Jenkins assumed that role in November 1960. Kelley assigned Defendant Kemp to investigate Rowe, who it was reported had impersonated an FBI agent. Kemp's interview with Rowe produced the admission that Rowe had indeed attempted to "impress someone sitting next to him at the bar," by claiming to be an FBI agent. Task Force Report on Gary Thomas Rowe, Jr., p. 30 ("Rowe Report".) Despite Rowe's apparent lack of discretion, Kemp began to consider Rowe as an informant because Rowe expressed an interest in law enforcement, and because Rowe said he had been approached about joining the Klan. (Rowe Report, p. 31).

A "thorough background investigation of Rowe" followed, producing the following information:

1. Rowe had, at age 14, lied about his age to enlist in the Georgia National Guard.

2. He dropped out of school in the eighth grade.

3. He was arrested by Savannah police, at age 18, for carrying a pistol without a permit, but was later acquitted.

4. He was married and divorced within a year, and then married again.

5. He was arrested at a bar in Birmingham in 1956 for *impersonating a police officer,* and was convicted.

6. "He was a frustrated, undereducated individual." (Kemp at p. 30 of Rowe Report, and Rowe Report, pp. 30–33.)

Kelley and other Bureau officials knew of Rowe's two attempts at impersonating a law officer but there is no indication of any concern on their part. The Rowe Task Force believed this information should have been considered in assessing Rowe's "stability and reliability." (Rowe Report, p. 34). The lack of concern of the Bureau, and particularly of the field office in Birmingham, is even more astonishing when the record discloses that the field offices had been admonished about this same problem only five months before:

> RACIAL INFORMANT PROGRAM—In one of our Southern offices recently, a discontinued potential informant on Klan matters misrepresented himself as a former FBI agent while testifying in a child custody hearing. Although he had operated as a potential informant for only a few months and had been discontinued for some time, this situation again points up the need for thorough, intensive background investigation and careful personal scrutiny of such individuals. Your attention is again directed to the need of preventing the development of an individual as a potential racial informant who may possess some weakness as to stability and reliability. (Citation omitted).

Despite this information the FBI recruited and employed Rowe as an informant. Rowe, at the FBI's direction, joined the Klan on June 23, 1960.

Another concern of the Bureau with regard to informants, was their propensity for violence. Rowe and Kemp disagree about the nature and extent of Rowe's violence during his employment by the FBI. Kemp can only remember receiving two reports through May of 1961 where Rowe admitted to engaging in acts of violence as an FBI informant. One was an incident at the Birmingham Trailways depot on May 14 in which Rowe physically attacked a Freedom Rider, and possibly a photographer; the other was an assault upon an elderly couple in their home prior to that date. Rowe insists that he took part in "many more beatings during this period." What is not in dispute is that Rowe admitted to Kemp the beating of the elderly couple *after* his employment by the Bureau, and *before* his activities involving the Freedom Riders. In fact the violence against the elderly couple occurred barely a month before the Freedom Rides into Alabama. (Rowe Report, pp. 41–45).

This, then, is the man the Bureau employed under its direction. In light of the FBI's investigation of Rowe and its specific knowledge of acts of violence committed by Rowe during his employment by the FBI, the government should have reasonably foreseen that its informant would participate in the planned acts of violence against the Freedom Riders.

### The FBI, Rowe, and the Klan: The Alabama Reception Planned for the Freedom Riders

After joining the Klan in 1960, Rowe rapidly gained the confidence of its leaders, and by May of 1961 had attained a position of responsibility in the organization. Rowe was granted additional responsibility by the Klan, in part because of his close connection with the Birmingham Police Department. Throughout this time, Rowe was passing on information to the FBI through SAC Jenkins and SA Kemp, and by May of 1961 these FBI agents believed Rowe's information to be reliable and credible.

Prior to May 14, 1961 Rowe provided information to the Bureau which disclosed the Klan sympathies of Sgt. Thomas Cook of the Birmingham Police Department, and of other Alabama police officers and officials. In fact, Rowe reported that Cook had gone so far as to provide the Klan with confidential information, and had offered protection from criminal prosecution on certain matters. In addition to such information about Cook, the FBI learned that Birmingham and Anniston police officers were, on occasion, cooperating with Klan mem-

bers to achieve the purposes of the KKK. Importantly, the Bureau learned prior to May of 1961 that Birmingham Police Chief Moore might have Klan sympathies and that, in any event, he supported Sgt. Cook. Thus, in the early Spring of 1961, the Bureau had excellent reason to believe that the Birmingham officials, vested with the responsibility for enforcing the law, extolled instead the principles of the Klan.

On April 17 Rowe reported to the Birmingham field office that, on April 13, Detective W.W. "Red" Self of the Birmingham Police Department had told him that Sgt. Cook wanted to speak with Rowe regarding the Klan. Self also enlisted Rowe's assistance in arranging a meeting between Robert Shelton, the Imperial Wizard of the Alabama Knights of the KKK, and "Bull" Connor "and his boys". Rowe did this by contacting Evert Page, a leading official in the Klan, who arranged the meeting. Following this meeting Page informed Rowe of the upcoming Freedom Rides which were to arrive in Alabama; Page said that he had learned of the Freedom Rides from Sgt. Cook. Page then instructed Rowe to do anything Cook wanted.

In addition to reporting the request of Det. Self to the Birmingham field office, Rowe also informed the Bureau that Shelton has asked him on April 16 whether he had talked to Cook since, as Shelton had put it, "it is very important that we get the information he has." On the morning of April 17 Rowe contacted Sgt. Cook and met with him at Ivens Restaurant in Birmingham, under the observation of two FBI agents seated nearby. At this meeting, Cook gave Rowe the names of various interracial organizations, the locations of their meetings, and the identities of persons attending these meetings. The Birmingham police sergeant asked Rowe to meet with him again on the morning of April 20, at which time he would give Rowe additional information regarding the organizations and the people involved in them. Cook wanted Rowe to arrange to have this information publicized by the Klan.

Cook also informed Rowe that he knew the FBI had an informant in the Klan's Eastview Klavern No. 13, the very klavern in which Rowe maintained a membership. In fact, the morning of his meeting with Rowe, Cook had called Special Agent C.B. Stanberry in the Birmingham field office and asked him if he knew whether Rowe was a member of the Klan. Stanberry denied any knowledge as to Rowe's status in the Klan and Cook pursued the matter no further. This information was transmitted to the Director of the FBI in a memorandum dated April 19, 1961 along with the following information which underscores the activities of Cook:

> It is noted in reference communication of September 30, 1960, that Detective JOE LINDSEY appeared to be a tie-in between the Eastview Klavern # 13 of THE ALABAMA KNIGHTS and the Birmingham Police Department.

> The election for the Commissioner of Public Safety will be held in Birmingham on May 2, 1961. The incumbent Commissioner, EUGENE (BULL) CONNOR, is trying to be re-elected, and Detective JOE LINDSEY has resigned from the Police Department and is also running for that office. Information has been received from various sources of the Birmingham Office that the Klan in the Birmingham area is backing LINDSEY for Commissioner. It is possible that Commissioner CONNOR is using COOK to help him line up votes from Klan members by feeding them information which comes to his attention, not only through their own informants, but also information received from this office, in order to ingratiate himself with members of the Klan. This is particularly significant since it is known by Agents of this office that COOK takes most of his orders directly from CONNOR and not from Chief MOORE. CONNOR himself has informed me that on one occasion he had sent COOK to New Orleans to obtain some information, and that he did not even tell Chief MOORE where COOK had gone or why.

CONNOR in the past has been outspoken to Agents of this office as being against the Klan, but it must be realized that he is an extremely strong segregationist, is an opportunist, and it is not believed that he would pass up any opportunity to become re-elected as Commissioner of Public Safety. (Plaintiff's Exhibit 27).

At their meeting of April 17, Cook explained to Rowe the plot which had been conceived to thwart the Freedom Riders. The Birmingham police sergeant told Rowe that Rowe and the KKK were to work not only with him, but also with the Birmingham Police and the Director of the Alabama Highway Patrol, in carrying out the plot and in preparing a reception for the Freedom Riders. Rowe described the conversation with Cook, in a deposition:

> . . . He said, "I've got it worked out now. You will work with me and I will work with you on the Freedom Riders. You can be assured that, "quote, "we," to me he says, "we're going to allow you fifteen minutes to beat, bomb," almost verbatim to the words he'd said previously, almost to the exact words. And he says, "You can beat 'em, bomb 'em, maim 'em, kill 'em, I don't give a —" I don't whether he said shit or the other word. I just don't recall, but it was a word like that used at the end. And he says, "There will be absolutely no arrests. You can assure every Klansman in the country that no one will be arrested in Alabama for that fifteen minutes. Now, when you get the signal from Red [Det. Self] to get the hell out of there, leave then, because we've only got about two minutes, three minutes at the most, you'll be swarmed with officers. . . ." (Deposition testimony of Rowe, p. 32, November 25, 1980).

Immediately following this meeting, the FBI was informed of the discussion between Rowe and Cook and of the developing plot against the Freedom Riders. Several further meetings were conducted between Rowe and Cook over the next few days regarding the plan to "beat, bomb, maim, or kill" the Freedom Riders, advancing the developing conspiracy between the Klan and the Birmingham Police Department. This is confirmed by another informant's report on May 5 to the FBI that, at a closed meeting of Eastview Klavern No. 13 on the night of May 4, CORE's Freedom Ride plans were discussed. The informant reported that Page instructed all Klansmen to remain near their telephones and to advise their group leaders when they left their residences over the weekend.

On May 3, FBI headquarters instructed the Birmingham field office to use care in furnishing information to the Birmingham Police Department, and discretion in its contacts with Bull Connor and Tom Cook in light of Cook's contacts with Rowe. This was done to protect Rowe's informant status. (Plaintiffs' Exhibit 37.) On May 5 a report was made to the Bureau, by an informant other than Rowe, that Page had also reported on CORE's plans at a closed meeting of the Warrior Klavern on May 4, and had stated at the meeting that three unidentified Klansmen would be traveling with the Freedom Riders. A May 5, 1961 "airtel" from the Director of the FBI to SAC Jenkins in the Birmingham field office confirms that the FBI was aware of KKK plans to have three Klan members ride the bus and accompany the Freedom Riders on their journey to Birmingham.

Rowe himself, on May 5, reported to the FBI that Cook had told Page about CORE's plans and that Page had stated that "the best way to handle the situation was to get all of the CORE representatives out of Alabama, as soon as possible." Rowe further informed the Bureau that Shelton planned to issue a press release stating that: " . . . it was up to the constituted authorities of Alabama to stop any demonstrations by CORE, but if state authorities did not do their duty, the Alabama Knights, KKKK, Inc. would do all they could to force the CORE representatives to leave Alabama." (See Defendants' Exhibits 14–16). The information about Shelton's planned press release was forwarded to the Director of the FBI on May 5, and to the Civil Rights Division of the Department of Justice on May 10 or 11, 1961. Cook informed the

Birmingham field office on May 9 of the Freedom Riders' plans to be in Birmingham on May 14, and of the identity of the participants, which information was teletyped to FBI headquarters in Washington. The information was sent on to the Civil Rights Division of the Department of Justice, on May 17.

On May 9, 1961 Bureau headquarters advised United States Attorney General Kennedy, Deputy Attorney General Byron R. White, Assistant Attorney General in charge of the Civil Rights Division Burke Marshall, and Assistant Attorney General J. Walter Yeagley, that Cook was furnishing an FBI informant-Klan member, with information from police department files for the use of the Klan. On May 10 FBI headquarters asked the Birmingham field office whether Shelton had issued his planned press release, and whether statements in the release about forcing CORE out of Alabama were well known. Headquarters advised that if this were so, information could be given to the Birmingham Police Department without compromising the informant. The field office replied that apparently the press release had not been issued, but that Klansmen were aware of Shelton's threat to force CORE out of Alabama, and that unless the field office were instructed otherwise, it would advise Chief Moore of the threat. On May 12, the Birmingham FBI office so informed Chief Moore.

On the evening of May 11 Rowe attended a Klan meeting at which the local Birmingham plans to stop the Freedom Riders were finalized. On May 12, 1961 Gary Thomas Rowe reported on the meeting to the FBI. Rowe indicated that following the meeting in which these plans were discussed, he had learned that Shelton had spoken to Cook regarding CORE and the arrival time of the Freedom Riders on May 14, 1961. Rowe also informed the FBI that Connor had stated that "if Negros go into the restaurant of the depot, the Klansmen should start an incident of some sort, such as a Klansman pouring coffee on himself and blaming it on the Negro, thus starting a fight. Also, if the Negros attempt to use the restroom in the depot, Klansmen are to beat them in the restroom and 'make them look like a bulldog got a hold of them'; then remove the clothing of the victim and carry the clothing away. If the nude individual attempts to leave the restroom, he will be immediately arrested and it will be seen that this person is sent to the penitentiary." (Plaintiffs' Exhibit 49, Memorandum Report to the Director of the FBI from SAC Birmingham, May 12, 1961). The Memorandum continued: "In reference to arrest of Klansmen, Connor supposedly stated that, if any Klansmen is arrested, he is to insist the Negro was at fault; and if any sentence is given to a Klansman, [Connor] will ensure that it will be a light one."

At the May 11 meeting, the Klansmen were advised to bring ball bats and clubs with them to greet the Freedom Riders. In addition, Rowe learned that Shelton was to arrive in Birmingham on May 12, to meet with Robert Thomas (an Exalted Cyclops of Eastview Klavern No. 13), and Klan members Herbert Page, Earl Thomas and Bill Holt, to discuss the arrival of CORE in Birmingham. Following this special meeting these Klan members were planning to attend the regular meeting of the Bessemer Klavern of the KKK.

The FBI also learned through Rowe that a special meeting of the Board of Directors for the Klan's state organization was set for May 13 at Tuscaloosa, Alabama at which time the CORE organization would be discussed. "The state organization of THE ALABAMA KNIGHTS and each individual Klavern has been placed on alert for May 14, 1961, and a special call has been made to the Klaverns of Gardendale, Warrior, Helina, Bessemer, and Eastview No. 13. All Klansmen from the respective Klaverns will be chosen [for participation in the planned Birmingham activity] at 9:00 A.M. Sunday morning, May 14, 1961 at a Squad Leaders meeting to be held at Eastview Klavern No. 13." (Plaintiffs' Exhibit 49.) This information was teletyped to FBI headquarters on May 12.

An undisclosed Anniston informant reported that the Anniston Klavern had been

instructed, at a meeting on May 12, that while no violence was to occur at the bus station when the Freedom Ride arrived in Anniston, access to the terminal facilities was to be denied the Freedom Riders by physically blocking the entrances. This information was also teletyped to FBI headquarters. The Director of the FBI understood the information to mean that "[the Anniston] group of Klansmen planned to prevent . . . (the Freedom Riders) . . . from using the facilities of the bus station at Anniston." (Plaintiff's Exhibit 72). While this group of Klansmen did not announce a plan to use violence in preventing the Freedom Riders from utilizing bus depot facilities, it is clear that this plan was part of the general statewide plot to deter the Freedom Riders from the time of their arrival in Anniston where an organized, and violent reception awaited them. In any event, the Bureau knew prior to May 14 that the Anniston Klan intended to prevent the Freedom Riders from exercising their rights on Mother's Day. And on May 14, before the Trailways bus reached Anniston, the Atlanta office of the FBI was notified by SAC Jenkins, that a mob was awaiting the Freedom Riders and that it appeared there would be violence. This information came from an Anniston informant.[5]

Taking into consideration the violent and explosive nature of the Klan, the Klan's hatred for organizations such as CORE, and the violent plot already conceived against the Freedom Riders, I find that the FBI knew or reasonably should have known that the Freedom Riders would encounter violence at least as early as Anniston, at the hands of the awaiting Klansmen, and with the approval of the local and state police.

By May 12 the FBI had developed a full and complete knowledge of the precise nature of the conspiracy between the Birmingham Police Department, the Alabama

Klans and others. A portion of the plan required Rowe to stay in close telephone communication with Cook from the bus station terminal, to insure that the timing of the assaults was carried out smoothly. That communication was especially important, since the waiting Klansmen had to alter their plans after the Greyhound bus was burned and disabled outside of Anniston. Hence, the Klansmen moved to the Trailways station to meet the arriving Freedom Riders. Cook's task was to determine the time of arrival of the buses and the route they would be taking in their travels through Alabama. The Trailways and Greyhound schedules called for their buses to leave Atlanta and stop only in Anniston before arriving in Birmingham. On May 12 Cook left for Anniston and Atlanta, where he apparently met with local Klan members in an effort to ensure that the plan already conceived was carried out. On the same day, Cook telephoned the local FBI office and inquired as to whether or not that office knew if the Alabama Knights intended any action upon the arrival of the CORE delegation in Birmingham in the event that the Birmingham Police Department did not adequately handle the situation. (Plaintiffs' Exhibit 49.)

The plot to injure and perhaps kill the Freedom Riders was one which involved all the Klansmen in the State of Alabama, as well as Imperial Wizard Shelton. Shelton had been traveling to the various Klaverns, including those in Anniston and Birmingham, recruiting their assistance in turning away the Freedom Riders from the State of Alabama. The Bureau knew of Shelton's activities and of his statewide exhortations. Additionally, the Bureau knew, as evidenced by a May 12, 1961 teletype to headquarters from the Birmingham field office, that 60 Klansmen were to be at the Greyhound bus terminal in Birmingham when

---

5. Gary Thomas Rowe had no information regarding plans for Klan activity in Anniston, before or after May 14. FBI Headquarters was aware of the situation in Anniston in large part because it had a resident agent there, Clay Slate. Slate reported to the Birmingham field office and was supervised by SAC Jenkins.

Information generated by Slate was, thus, passed on to Washington by the Birmingham field office, and Slate was kept advised of Headquarters' communications on the Freedom Rides. (Testimony of Thomas J. Jenkins, Plaintiffs' Exhibit 239 at pp. 640, 683 and 710.)

the Freedom Riders arrived, and that Shelton had talked with Cook, who was verifying the itinerary of the Freedom Riders. The FBI received information that Commissioner of Public Safety Connor had announced: "By, God, if you're going to do this thing do it right," when he indicated that he would see to it that 15 to 20 minutes would elapse before the police arrived. (Plaintiffs' Exhibit 49.) In response to this information, Section Chief Clement McGowan of FBI headquarters telephoned Birmingham Assistant SAC Kenneth Raby, instructing him to tell Chief Moore of the possibility of violence. According to Raby, the report to Moore was to be in general terms; he was neither to furnish information regarding Connor's statements reported at the May 11 Klan meeting nor specifics concerning the plan to greet the Freedom Riders at the bus terminal, so as not to compromise the identity of the informant. McGowan, on the other hand, testified in his deposition that he told Raby that Moore should be informed of the possibility of violence, and that he had stressed to Raby that the information had to go out even if the identity of an informant was exposed. (Deposition of McGowan, December 28, 1982, p. 38.) At any rate, McGowan instructed Raby to tell Moore that even a spark could set off serious violence.

Pursuant to these instructions the Birmingham field office contacted Chief Moore on May 13. While Jenkins did inform the Birmingham Police Department that an incident might occur, he did not pass on the information regarding Cook and Connor, since he felt that Rowe's identity must be protected and that any information relating to these individuals would compromise that identity. On May 13, Assistant FBI Director Alex Rosen informed Assistant to the Director Parsons of the information received, and the Mobile, Alabama field office of the FBI also alerted the Director and SAC in Birmingham on this date that if the Freedom Riders got past Birmingham, violence awaited them in Montgomery.

Also on May 13, Jenkins learned of the fact that Chief Moore planned to be absent from Birmingham the following day, even though Moore knew of the violent reception planned for the Freedom Riders. Jenkins assumed that the person in charge of the operations of the Birmingham Police Department would be Sgt. Cook, because of Cook's supervisory role in racial matters. Thus, Jenkins continued to communicate with the Birmingham Police Department through Cook, passing along information on May 14 relative to the arrival of the Freedom Riders. In doing so Jenkins totally disregarded the known fact that Cook, and Connor (Moore's and Cook's supervisor), were integral members in the conspiracy.

In his deposition at page 788, Jenkins stated that he went to his office on Sunday, Mother's Day, May 14, 1961 because he had information that the Freedom Riders were coming into Birmingham and he suspected that there might be violence or "most anything could happen". The Birmingham Field office was advised at 1:51 P.M. on May 14, 1961, that the Freedom Riders would be met in Anniston by a group of 200 demonstrators. (Plaintiffs' Exhibit 61.) Plaintiffs' Exhibit 63 reveals that Jenkins told FBI headquarters about the beatings of the Freedom Riders at the Trailways terminal in Birmingham within 15 minutes of that occurrence.

Rowe testified that he had been assured by his Bureau contacts that the FBI would never allow the violence to occur:

Q. Now, I believe that—strike that. Prior to the actual incident at the bus station, did you expect that the Klan would be permitted to beat the Freedom Riders?

A. Absolutely not.

 * * * * * *

Q. And why was that?

A. I felt that the department would not allow that to happen. *In fact, I was assured of that.*

Q. When you say the department, who do you mean?

A. The Department of Justice, the FBI.

Q. And you were assured of that prior to the incident itself?

A. Absolutely.

Q. And who assured you?

A. I believe it was Agent McFall was the agent that actually told me that, but I'm not going to swear to it. I don't recall, but I believe Agent McFall was the one that told me, 'Never would we allow this to happen.' Some agent told me that, I can assure you of that.

Q. An FBI agent?

A. That's correct.

Q. And based on that assurance it was your understanding that the FBI was going to stop this from happening in some way?

A. That's correct.

Q. Did you have any further discussions as to the details as to how the FBI was going to stop it?

A. In the discussion the fact had the whole—I believe they told me the whole 101st Airborne out there. Hell, you know, we just—nothing like that could be allowed to happen, that's what I was told.

Q. Okay, and it was based on those assurances that you continued your activity?

A. That's correct. (Rowe Deposition, November 25, 1980, pp. 97–99). (Emphasis supplied.)

The incident, however, did occur. The Bureau did not stop Rowe's participation nor did it prevent or hinder the carrying out of the conspiracy.

Not only did the government fail to prevent the violence on May 14, but its own informant, Rowe, was one of the attackers on the Freedom Riders in Birmingham. Indeed, a photograph introduced in evidence shows Rowe beating a man who appears to be Freedom Rider James Peck.[6] While Rowe had been cautioned about partaking

in the violent activities of the Klan, the Bureau concluded after a period of time that if information were to be gained about violence then Rowe would have to do what had to be done.

Despite all of the information the FBI had, it did not inform the Civil Rights Division of the Department of Justice of the specifics, or the extent of the statewide conspiracy of violence until after May 14, 1961. Upon receiving these details, the ranking officials within the Department of Justice and the federal government took action to protect the Freedom Riders and to stop further mob violence in Alabama. On May 18, 1961 Assistant Attorney General Burke Marshall wrote to the FBI that the Civil Rights Division would assume jurisdiction over all possible violations of the federal law growing out of the incidents in Birmingham and Anniston on May 14, 1961. The Bureau was instructed to investigate both incidents for possible violations of 18 U.S.C. §§ 241 and 242 and to investigate whether local law enforcement officers had deliberately withheld protection.

Defense Exhibit 84 indicates that the President of the United States attempted to contact Governor John Patterson of Alabama on May 19, 1961. Unable to reach Patterson the President had the Attorney General of the United States write to Governor Patterson as well as issue a press release from the Department of Justice. The Attorney General indicated to Governor Patterson that: "Since the destruction of the bus on Sunday and the interference of interstate travel you have been aware of our clear responsibility in this area. The President himself when he was unable to

---

**6.** In *Peck v. United States,* 470 F.Supp. 1003, 1020 (SD N.Y.1979), Judge Stewart, discussing a statute of limitations "notice" issue, indicated that there was nothing in the record to show that Rowe was actively involved in the beatings which took place in Birmingham. Judge Stewart's opinion excerpted a portion of a Government Memorandum of Law, wherein it was stated that during cross-examination Rowe denied that he was the assailant depicted in a photograph of the Birmingham incident which appeared in the *Saturday Evening Post.*

However, in a more recent deposition filed in this case, Rowe admitted that a photograph shows him participating in the attack. Further, the record indicates that Rowe had been pressured by the Bureau to deny any active participation in the Birmingham incident. Based on the record, I find that the preponderance of reliable evidence reveals that Rowe was at the Birmingham bus depot and did actively participate in the attack on the Freedom Riders there.

reach you Friday made this clear to the Lt. Governor and pointed out that the federal government has the responsibility to guarantee safe passage in interstate commerce and that free travel had not been possible for five days in Alabama."

*Plaintiffs' Expert Witness: What the FBI Could Have Done*

During the weeks and days preceding the Freedom Riders' arrival in Alabama on May 14, 1961 the FBI, then, had uncovered considerable and detailed knowledge of the conspiracy, and of how the violence was to occur. That agency did nothing to prevent such violence. Plaintiffs called an expert witness, Robert DiGrazia, to answer the question of what the FBI could have done, and to aid the Court in determining what the FBI should have done under these circumstances.

This witness has considerable experience in the field of law enforcement dating from 1959. He had served as a sheriff's deputy, police officer, and Chief of Police in a suburban community outside of San Francisco, California. He had been Chief of Police of St. Louis County, Missouri. He was Police Commissioner in Boston, Massachusetts from 1972 through 1976 and was subsequently Police Commissioner of Montgomery County, Maryland, a large metropolitan suburban area outside of Washington, D.C., for a number of years. While Police Commissioner in Boston, DiGrazia was confronted with a number of racial disturbances surrounding a Court ordered busing plan implemented to achieve racial balance in the Boston school system. A crisis situation arose in 1974 and did not begin to abate until the beginning of the school term in the fall of 1976.

DiGrazia described the volatile elements which made up the situation that confronted him during this period of time in Boston and his actions in attempting to maintain order. There were angry and racially hostile mobs and large groups of people confronting the buses carrying school children. Well-organized and potentially violent organizations opposed to busing, similar to the KKK, were active in the city. In addition, DiGrazia testified that a number of police officers, probably the majority, were sympathetic to the anti-busing movement. Of these officers, some were suspected of being active participants in conspiracies to engage in violent activities designed to thwart the implementation of the court order, including the passing along of information regarding police matters directly to the organizations which were planning violence. The police commissioner utilized sources and secret informants as conduits of information regarding the conspiracies taking shape during this period, and used the information provided by these sources and informants, at the same time attempting to protect their identities.

The witness also maintained a close working relationship with other local and federal law enforcement agencies, including Federal Marshals and the FBI. In particular, DiGrazia testified that a federal presence such as the FBI, at locations where violence was threatened, was valuable in keeping the peace. This presence, particularly when the FBI agents carried photographic equipment, would often deter threats of violence from becoming acts of violence. The police commissioner also described a lengthy and intense campaign which police officials had conducted to educate the community about what was happening. Through written educational material, the police advised that violent activity was, by its very nature, criminal, and that the entire community was certain to suffer. The educational programs also stressed the determination of the police to maintain the peace, arresting and prosecuting where necessary. In addition, DiGrazia testified that direct communication was established with organized groups such as the South Boston Marshals, a Klan type organization. These groups were advised that the police knew what the groups were planning, and that there would be arrests if the plans were executed. This, the witness testified, tended to prevent violence before it occurred.

According to DiGrazia, these devices are easy, inexpensive, well known to police

communities, and very effective. He further opined that such procedures were known in law enforcement circles in 1961.

Presented with a hypothetical question outlining the factual circumstances of the Freedom Ride in May 1961, the involvement of the KKK and local and state law enforcement officials in a conspiracy to deprive the Freedom Riders of their rights, and the failure of the FBI to do anything to prevent the planned incidents from occurring (other than to pass on general information to Chief Moore prior to May 14 and to Sgt. Cook on May 14,), DiGrazia expressed the following professional, expert opinions: [7]

1. A number of well recognized law enforcement techniques could have been used to prevent and deter violence, including: the presence of federal agents with cameras; notice to Klan officials that their plans were known to the FBI and that they would face the possibility of arrests if they were to carry out those plans; and notice to the local police and state police that the FBI expected these agencies to do their constituted jobs, and that if they did not, the FBI would take necessary action.

2. If these steps had been taken, in all probability the violence which erupted on May 14, 1961 could and would have been prevented.

None of these precautions were undertaken by the FBI in Anniston or Birmingham in 1961. While the FBI was aware of the principal actors in the plot, federal knowledge of the conspiracy was never conveyed to those actors, nor did FBI agents make their presence known and felt in Anniston or Birmingham on May 14. After the fact, and as a result of the beatings on May 14, the federal government put pressure on state and local officials to protect the Freedom Riders; used the FBI as visible observers at interstate facilities; filed an action for injunctive relief against the Klan and local officials; alerted the military; sent United States Deputy Marshals into the South to protect the Freedom Riders; and used community leaders to put pressure on local authorities to perform their constituted duties and so protect the Freedom Riders.

### The Individual Defendants

On March 7, 1983 the Court granted Plaintiffs' Motion for a Mistrial as to individual Defendants Thomas Jenkins and G. Barrett Kemp, leaving as Defendants in this trial the United States of America and four unknown and unnamed agents of the Federal Bureau of Investigation. In a decision from the Bench, I concluded that mistrial must be granted in light of the special circumstances surrounding Defendants Kemp and Jenkins, following the imposition of sanctions against the United States:

Finally, I am concerned about what to do with the individual defendants, Kemp and Jenkins. As noted above, the imposition of sanctions against the United States raises a very serious question as to whether the same, or any, sanctions can and should be imposed upon defendants Kemp and Jenkins. This issue is complicated by several considerations. First, because Rule 37(b) relates solely to situations in which the Court has made an order to provide or permit discovery and a party has failed to obey it, the Court must take into account the fact that both Kemp and Jenkins were ordered, along with the other defendants, to produce the documents at issue. Thus, it appears at first blush that both Jenkins and Kemp would come within the plain language of Rule 37(b) as disobedient parties. However, such a conclusion ignores the fact that apparently neither Kemp nor Jenkins had access to or control over the documents which the government has refused to tender. This apparent inability on the part of the named individual defendants would seem to militate against

---

**7.** DiGrazia's opinions are closely mirrored by Supreme Court Justice Byron R. White, who in 1961 was the Deputy Attorney General of the United States; by Burke Marshall, Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice; and by FBI Section Chief C.L. McGowan. Their testimony is discussed below, at pp. 1398–1399.

the imposition of sanctions, at least at this juncture.

A second complicating factor relates to the fact that Kemp and Jenkins are both being represented in this litigation by R. Joseph Sher, the same attorney who is representing the government. While that arrangement does raise some potential conflicts, the most disturbing aspect of it for present purposes relates to Mr. Sher having the unfair advantage of knowing the contents of those documents which the government has declined to permit the plaintiffs to discover. This is a problem for the Court because it offends the Court's sense of justice to permit the individual defendants to reap the benefits of the government's disobedience. If Kemp and Jenkins are not subjected to the same sanctions as is the government, then they would be able to defend this lawsuit while using information their attorney obtained as counsel to the government and which information was kept from the plaintiffs in violation of this Court's order. Such an anomalous result does not appear to be in keeping with the ideal of fairness to all parties. (Transcript of Trial, Vol. IV, pp. 28–30).

While not mentioned at that time, I was also concerned about the remaining individual Defendants, that is, the four unknown and unnamed agents of the Federal Bureau of Investigation. Those concerns were and are identical to those I expressed regarding Defendants Jenkins and Kemp, namely, the fact that defense counsel for the government also purports to represent past or present individual employees of the FBI, who, like Defendants Jenkins and Kemp, do not have control over the requested documents. Thus, the imposition of sanctions against these unknown individuals would also be inappropriate. This is especially so because that defense counsel, by virtue of his simultaneous representation of these individual Defendants and the United States government, has created a potential conflict of interest; the interests of the individual

Defendants and the government are certainly not the same and, particularly with regard to the previously discussed production issue, may be diametrically opposed.

That conflict must be resolved prior to the Court's consideration of the liability issues. Accordingly, at this juncture the Court will consider only the government's liability under the Federal Tort Claims Act, and will defer ruling on the claims asserted against the remaining individual Defendants until such time as counsel for all parties have had an opportunity to examine the propriety of the entry of a mistrial as to those Defendants. That will necessarily require an evaluation of the potential conflict stemming from one group of lawyers' representation of several Defendants whose interests may be dramatically divergent, as well as the question of whether or not government production is in the best interests of the individual Defendants. Counsel shall inform the Court of their intentions thirty (30) days following the issuance of this Opinion and the Court will then determine whether a mistrial ought to be ordered.

### Statute of Limitations

Because this Opinion addresses only Plaintiffs' claims against the government under the Federal Tort Claims Act ("FTCA"), there is no statute of limitations issue for the Court to resolve at this time. The FTCA statute of limitations, and its application to this case, are discussed at length in the Court's Opinion on Defendants' Motion for Summary Judgment.[8] In that Opinion I concluded that Plaintiffs' FTCA claims were commenced well within the two year limitations period.

However, a tangential limitations and accrual issue has been raised by the government in response to Plaintiffs' argument that the government was negligent *per se* because it violated 42 U.S.C. § 1986.[9] That statute contains a one year limitations period, which the government contends is insep-

---

**8.** *Bergman v. United States,* 551 F.Supp. 407, 420–422 (WD Mich.1982).

**9.** This theory is discussed below under Conclusions of Law, pp. 1394–1395.

arable from the duty imposed by the statute. As discussed below, I find that Plaintiffs' tort cause of action, though it draws upon § 1986 to define the government's duty within the context of Alabama tort law, does not depend upon compliance with the limitations period in § 1986. However, a review of the facts discloses that Plaintiffs filed this action within one year of the accrual of at least part of their claim.

Rowe surfaced as an FBI informant in late March or early April of 1965, when he testified in three widely publicized trials against the accused murderers of civil rights worker Viola Liuzzo. The FBI had not revealed Rowe's identity as an informant, even to other law enforcement agencies until after the slaying of Liuzzo. During the course of Rowe's testimony in 1965, it was revealed to the public that Rowe was present at the Trailways bus station at Birmingham on May 14, 1961; that he witnessed much of the violence there and knew the identities of many of the individuals who participated in it; that he was an informant of the FBI at that time; and that he called the FBI office on May 14, 1961 prior to going to the bus station. However, until Rowe testified before the United States Senate Subcommittee on December 2, 1975, neither the statewide conspiracy and the FBI's involvement through Rowe, nor the extent of the FBI's prior knowledge were publicly known. Accounts of Rowe's testimony before the subcommittee and of his primary role in the conspiracy as an FBI informant, appeared in newspapers, and on radio and television at the time of his Senate testimony.

Attorney Dean Robb contacted Dr. Bergman in December 1975, shortly after Rowe had testified before the Senate Committee, and alerted him to the possibility of filing suit against the United States. At that time, Robb did not know that Bergman had been beaten in Anniston; nor did Robb, when he later read Rowe's Senate Subcommittee testimony, discern any references to the FBI's involvement in the beatings at Anniston. Likewise, the Plaintiffs did not discover, after Robb mailed a copy of the transcript of Rowe's testimony to them, any references to Anniston in that testimony.

Attorney Charles Morgan had initially contacted Robb regarding Rowe's testimony and its alleged legal implications. When Robb spoke with Dr. Bergman in December, Robb requested Bergman to forward any clippings or other materials Bergman might have concerning his beating, and told Bergman that he would have to call Morgan back "and tell him to see if this involvement in Birmingham was also true in Anniston...." (See Defendants' Exhibit 60.) Robb wrote to Morgan on February 24, 1976 requesting more information, since he had still not established a connection between the events in Birmingham and Anniston. Thus that connection had not been established by January 4, 1976, one year before this lawsuit was commenced. At that time, Plaintiffs were still unaware that their injuries had been caused by the government's negligence. *See Barrett v. United States,* 689 F.2d 324 (CA 2 1982).

In January 1976, and before, Robb and the Plaintiffs could, at the most, only have suspected that a statewide conspiracy existed which involved the FBI's knowledge of any acquiescence in the Anniston beatings. This suspicion, standing alone, is insufficient for a cause of action to accrue under *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). *Stoleson v. United States,* 629 F.2d 1265 (CA 7 1980). As discussed at length in my Opinion (551 F.Supp. 407), the court in *Kubrick* held that a cause of action under the Federal Tort Claims Act accrues only after the litigant has knowledge of both his injury and the cause of his injuries, since "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." 444 U.S. at 122, 100 S.Ct. at 359. Here, the evidence revealing the FBI's involvement in Anniston and the entire statewide conspiracy was under the tight control of the United States and, came to be known by Plaintiffs only sometime after Rowe's Senate hearing testimony.

The government argues that this Court's analysis of *United States v. Kubrick, supra,* and the question of accrual, is inapplicable to the instant Federal Tort Claims Act cause of action. The government, however, ignores the directives of *Kubrick,* as discussed in the Opinion upon Motion for Summary Judgment, and I am not only unable, but unwilling, to pass judgment upon the wisdom of the Supreme Court in deciding *Kubrick* in the manner in which it did.

 In summary, Plaintiffs' Federal Tort Claims Act claim is asserted under a two year statute, and the instant suit was commenced in January of 1977, well within the two year period even as measured from Rowe's disclosures in December of 1975. As a consequence, it is not time barred.[10] (*See Bergman v. United States,* 551 F.Supp. 407 at 419–422.) While not necessary to the resolution of this action, I also find that Plaintiffs commenced this lawsuit within one year of the accrual of their cause of action at least insofar as that cause relates to Anniston.

### Conclusions of Law

The Federal Tort Claims Act constitutes a limited waiver of sovereign immunity, and authorizes suit against the United States, making the federal government liable in the same manner and to the same extent as a private party for certain torts of federal employees acting within the scope of their employment. Title 28 of the United States Code, § 1346(b) provides that this liability is to be imposed:

... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

 Accordingly, the Court must look to the law of the state where the tort allegedly occurred. Here, Alabama law must supply the basis of liability. However, while state tort law is the source of a cause of action brought under the Federal Tort Claims Act, federal law may still be relevant to the analysis of the state cause of action. *Schindler v. United States,* 661 F.2d 552 (CA 6 1981). In *Schindler* the court opined:

In determining the first element, the existence of a duty from the plaintiff to the defendant (sic), the federal regulatory statute may be relevant in defining the scope of the undertaking of the United States and the plaintiff's right to rely thereon, if the action is based on an alleged failure of the United States to observe its own regulations. The federal regulation or statute may also be relevant in assessing the second element of the cause of action, if, under state law criteria, it may be considered the kind of statute or regulation violation of which is negligence *per se. Id.* at 560–561. (Footnotes omitted.)

 Violations of a statute as negligence *per se* is recognized in the jurisprudence of the State of Alabama. *Cosby v. Flowers,* 30 So.2d 694, 249 Ala. 227 (1947); *Winfrey v. Witherspoon's, Inc.,* 71 So.2d 37, 260 Ala. 371 (1954). Negligence *per se* depends on the postulate that the statute violated is designed for the protection of the person claiming to have been injured. *Sims v. Greniewicki,* 184 So.2d 157, 43 Ala.App. 159 (1966). Four elements are necessary to establish this cause of action: (1) the statute must have been enacted to protect a class of persons which includes the litigants seeking to assert the statute; (2) the injury suffered by the plaintiff must be of a type contemplated by the statute; (3) the party charged with negligent conduct must have violated the statute; and (4) the statutory violation must have proximately caused the injury. *Fox v. Bartholf,* 374 So.2d 294, 295–296 (Ala.1979).

### 42 U.S.C. § 1986

Plaintiffs contend that the government violated 42 U.S.C. § 1986, which provides in pertinent part:

---

**10.** Since I have concluded that this cause of action was timely filed under *Kubrick* I will not address whether the Government fraudulently concealed from the Plaintiffs its alleged wrongful activities from 1961 to the present. Additionally, because the action was timely filed, I conclude that it is not barred by the equitable doctrine of laches.

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented. . . .

The government argues that the Plaintiffs may not utilize this statutory section in support of their Federal Tort Claims Act theory of liability, since the one year statute of limitations contained in § 1986 had expired when the action was filed, thereby extinguishing a right of action under that statute. While the Court has already determined that the period of limitations with respect to that statute has not run, it nonetheless is persuaded that, assuming *arguendo* it did expire, Plaintiffs could still proceed upon this theory. In *Moran v. United States,* 102 F.Supp. 275 (D.Conn.1951), the government sought to dismiss a cause of action brought by the plaintiff under the FTCA based upon the death of an employee on a fishing vessel. The government moved for dismissal arguing that the case should have been brought under the Death on the High Seas Act, 46 U.S.C. § 761 et seq., and under that Act's statutory limitations the plaintiff's cause of action would be barred.

The court disagreed, holding that the action was properly brought under the FTCA, opining that:

> . . . but for the Tort Claims Act, the right of action for wrongful death created by the Death on the High Seas Act would have been extinguished by lapse of time, the Tort Claims Act was effective to extend the reach of the Act to the United States and to fix the time within which action thereunder against the United States might be brought. . . . *Id.* at 279.

*See also State of Maryland v. United States,* 165 F.2d 869 (CA 4 1947).

In this case, while § 1986 sets forth its own period of limitations, the FTCA is effective to extend the reach of that section. Most importantly though, § 1986 is not being used as a right of action but only under *Schindler, supra,* as a relevant element to the demonstration of what duty the government had and whether or not that duty was breached. Such use of § 1986 does not extend the government's liability under that section beyond the statutory time period. Rather, the tort claim put forward here draws upon § 1986 solely as a legislative declaration of duty. Thus, in the final analysis, the limitations period of § 1986 is completely irrelevant to this tort cause of action.

The facts of this case satisfy all of the requirements for the application of negligence *per se* under Alabama law. First, both Plaintiffs Walter and Frances Bergman are within the class of persons which § 1986 was designed to protect since, by its terms, § 1986 was designed to protect those persons who are the potential victims of a conspiracy as outlined in 42 U.S.C. § 1985(3). Section 1985(3) was originally enacted by Congress as part of the Ku Klux Klan Act, in order to enforce the Civil War Amendments to the Constitution, and to provide a means of redress for persons victimized by acts of terror and intimidation by the Klan and others. The statute imposes civil liability on persons conspiring to deprive another person or class of persons of, "(T)he equal protection of the laws, or the equal privileges and immunities under the laws." The elements of a cause of action under this provision are set forth in *Griffin v. Breckenridge,* 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

In the case *sub judice,* Plaintiffs and all of the Freedom Riders were the objects of a conspiracy because they sought to exercise their right to equal protection of the laws and their right to travel freely.

The conspiracy against the Freedom Riders, involving the KKK, and local officials, was in clear violation of 42 U.S.C.

§ 1985(3), and the Defendants do not claim otherwise.

That § 1986 was therefore also violated cannot be seriously questioned. Prior to Mother's Day 1961, agents, supervisors, and the Director of the FBI were aware of the statewide plan of racial violence. Through its agents, the government not only had knowledge of the far-ranging conspiracy but knew of the acts taken in furtherance of the plot. The United States could have prevented the conspiracy from being carried out, or at least could have taken steps which would have prevented the specific acts of violence, as DiGrazia's testimony established. The later actions taken by the United States to stop further attacks on the Freedom Riders after May 14 demonstrate that the government had the power and capability to prevent the events of Anniston and Birmingham. Despite all of this, the government failed to act. By so failing to prevent the violation of 42 U.S.C. § 1985(3), the government violated § 1986.

Since § 1986 was designed to prevent injuries which might result from a racially inspired conspiracy, Plaintiffs' injuries (to the extent they may be proved) were clearly within the ambit of protection the statute seeks to provide by this statute.

The government was therefore negligent *per se* under Alabama law, and is liable for injuries sustained by the Plaintiffs as a result of its inaction. *Fox v. Bartholf, supra; and see Schindler, supra.*

### Title 28 U.S.C. § 533

In addition to the government's dereliction of duty and negligence *per se* under the foregoing analysis, the United States breached its duty under 28 U.S.C. § 533, which provides in pertinent part that FBI officials are appointed: " . . . to detect and prosecute crimes against the United States." None of the litigants in this lawsuit question that § 533 imposes some duty upon the FBI. Rather, at issue here is the nature of that duty. The FBI claims that it is merely an investigatory agency performing only investigative functions; Plaintiffs contend that under the circumstances of this case, the FBI was required to do something more than listen and take notes.

■ While § 533 confers investigative powers on an FBI official, it also confers an affirmative prosecutorial duty to take whatever steps are necessary to bring criminal charges against the suspect criminals. *Weinberg v. United States,* 126 F.2d 1004 (CA 2 1942).[11] This duty includes timely informing prosecutorial authorities in the Department of Justice that a crime has allegedly been committed.

■ In view of the information the FBI had acquired prior to May 14, 1961, regarding the conspiracy against the Freedom Riders, the Bureau had strong reason to believe that a violation of 18 U.S.C. § 371 had been detected. Under that section it is a federal crime to conspire to commit any offense against the United States, where any act is done to effect the object of the conspiracy. In this case, the object of the conspiracy was a violation of 18 U.S.C. § 242: deprivation, under color of state law, of rights, privileges and immunities secured or protected by the Constitution or laws of the United States, on account of race. As the facts of the case disclose, the FBI not only received a continual stream of information concerning the plan to interfere with the Freedom Rides and to injure the Freedom Riders, but had advance knowledge about definite steps taken to put that plan into action. The FBI was advised of this criminal conspiracy well before the events of May 14. If the FBI had transmitted all of its information to the Civil Rights Division of the Department of Justice, that agency could have authorized the prosecution of the suspected perpetrators. However, the FBI did not pass its information to Justice until four days after the assaults on the Freedom Riders in Birmingham and Anniston. (Plaintiffs' Exhibit 208.) As dis-

---

**11.** This question was also discussed in *Bergman v. United States,* 551 F.Supp. 407, 417 (WD Mich.1982).

cussed below this was a breach of the FBI's duty as found in 28 U.S.C. § 533, and the violation of this statutorily defined duty constituted negligence *per se.*

### 18 U.S.C. § 242 and the Right to Travel Interstate

The right to travel interstate has long been regarded as a fundamental privilege and immunity of national citizenship under the Constitution. *Crandall v. Nevada,* 6 Wall. 35, 48–49, 18 L.Ed. 745, 748–749 (1868); *Williams v. Fears,* 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186 (1900); *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908); *Edwards v. California,* 314 U.S. 160, 177, 62 S.Ct. 164, 168, 86 L.Ed. 119 (1941) (concurring opinion), 181 (concurring opinion). Like other rights of national citizenship, it is within the power of Congress to protect the right to travel by appropriate legislation. *Ex Parte Yarbrough,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); *Mitchell v. United States,* 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201 (1941); *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Henderson v. United States,* 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302 (1950); *Boynton v. Virginia,* 364 U.S. 454, 81 S.Ct. 182, 56 L.Ed.2d 206 (1960). The right to travel interstate was explicitly recognized in 1961 as one of the federal rights protected by 18 U.S.C. § 242. *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *United States v. Williams,* 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 (1950), (plurality and dissenting opinions).

Under § 242 and § 371, the most serious charge that could have resulted was a misdemeanor. FBI agents could only make arrests when misdemeanors were committed in their presence. 18 U.S.C. § 3052. Pursuant to FBI policy in 1961 agents were not to make arrests, or even undertake investigations, until the Civil Rights Division of the Department of Justice had directed and approved such action. The United States urges that no misdemeanor was committed under the circumstances, nor was there the kind of information to take to a judicial officer for a warrant.

■ The FBI is mistaken. Sufficient and credible information was obtained by the FBI, prior to May 14, 1961, describing in detail a statewide conspiracy which relied heavily upon involvement of individuals acting under the color of state law and working in concert with an FBI informant. This information should have apprised the FBI, in the reasonable and prudent exercise of its duty under 28 U.S.C. § 533, that a conspiracy to violate § 242 of Title 18 had been detected. The information should have been transmitted to the Department of Justice. Since the specific information concerning the conspiracy was not timely transmitted to that Department, the Civil Rights Division had no opportunity to provide direction to the FBI. Moreover, the policy of the FBI with regard to misdemeanor arrests cannot obviate the FBI's responsibility since the Bureau should have been at the scene of the beatings in both Anniston and Birmingham, where agents would have detected violations of § 242 and acted accordingly. In fact, the evidence offered at trial indicates that one or more FBI agents may actually have been present when the assaults occurred.

### 18 U.S.C. § 241 and the Right to Interstate Travel

Because I find that the FBI had detected a conspiracy to violate 18 U.S.C. § 242, I need only discuss the FBI's duty in light of its knowledge of that crime. However, it also appears that at the time the FBI reasonably should have been aware that the information it had obtained concerning the statewide conspiracy constituted a violation of federal criminal law under 18 U.S.C. § 241 as well.[12] Section 241 provides that it is a crime to

---

12. Title 18 U.S.C. § 241 not only guarantees the safety and protection of persons in the exercise of rights dependent on the Constitution, but also those guaranteed by federal law.

*United States v. Waddell,* 112 U.S. 76, 79, 5 S.Ct. 35, 36, 28 L.Ed. 673 (1884). The Plaintiffs contend that in addition to their constitutional rights, the Freedom Riders were exercising

... conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

The right to travel interstate is a basic, fundamental right under the Constitution, its origins premised upon a variety of constitutional provisions. *United States v. Guest,* 383 U.S. 745, 757, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966). By dicta in its opinion in *United States v. Wheeler,* 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (1920) however, the Supreme Court had failed to recognize those diverse sources of the right, and had stated that protection of the right to travel interstate from interference by state action was beyond the ambit of § 241. Thirty-one years later, in *United States v. Williams,* 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 (1951) the Supreme Court discredited this aspect of *Wheeler* when it discussed the scope of § 241. Four Justices in that plurality opinion held that § 241 only addressed private conspiracies involving rights arising from the relationship of the individual with the federal government, and not those which are guaranteed against interference by the state under the Fourteenth Amendment. The four dissenters, on the other hand, concluded that § 241 was not so circumscribed at all, but reached private conspiracies as well as conspiracies under the color of state law. The dissenters, therefore, implicitly agreed that § 241 also protected those rights not secured by the Fourteenth Amendment. Since the right to interstate travel had been held to find constitutional protection independent of the Fourteenth Amendment, *Wheeler* was therefore discredited and limited to its facts. Accordingly, pursuant to *Williams,* the right to travel interstate was protected

from interference by both private conspiracies and those under color of state law, under § 241 of Title 18. This interpretation of § 241 was confirmed by the Supreme Court in *Guest,* five years after the attacks upon the Freedom Riders in 1961.

Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass these differences further. All have agreed that the right exists. *Its explicit recognition as one of the federal rights protected by what is now 18 USC § 241 goes back at least as far as 1904. United States v. Moore,* 129 F. 630, 633 [5th Cir.]. *We reaffirm it now. Id.,* 383 U.S. at 757, 86 S.Ct. at 1177. (Emphasis supplied.)

The government argues today that it should not be held to have known in 1961 that the conspiracy was a violation of § 241. However I note that three years following the Mother's Day incident, the United States in *Guest* pursued an indictment under § 241 to prosecute a conspiracy to interfere with the right to travel. Interestingly, as Plaintiffs note, no major upheavals in the law surrounding § 241 can be identified between the years 1961 and 1964.

 While the exact scope of § 241 may have been somewhat cloudy in 1961, the violation of 18 U.S.C. §§ 371 and 242 was apparent. In light of all of these criminal provisions, and given the extent of the information known to the FBI, I find that the Bureau knew that a federal crime had been committed, that the conspiracy was still active, and that further criminal activity was likely to occur. The government maintains that even under these circumstances, § 533 did not require further action by the FBI. I disagree. The position which the FBI

rights granted by federal statute, as the rides were instigated in response to the Supreme Court's 1960 decision in *Boynton v. Virginia, supra.* That case held that discrimination in facilities forming a part of the interstate bus service was in violation of § 216(d) part II of the Interstate Commerce Act, 42 U.S.C. § 216(d). The distinguishing facet of the decision was that the Interstate Commerce Act

only applied to "common carrier(s) by motor vehicle." While *Boynton* unquestionably stated the law on the subject in 1961, it cannot serve as a basis for federal intervention pursuant to 18 U.S.C. § 241 where the Plaintiffs have not demonstrated that either Trailways or Greyhound were parties to a conspiracy which resulted in the beating of the Freedom Riders.

took in reaction to the knowledge gained is simply untenable and inconsistent with what the Department of Justice expected the FBI to do under the circumstances.

### The Department of Justice and the FBI's Duty under 28 U.S.C. § 533

The untenable nature of the FBI's position is particularly brought to light in view of the testimony of Supreme Court Justice Byron White, who in 1961 was the Deputy Attorney General of the United States. Justice White in his deposition of December 6, 1982 related that one of the policies of the Kennedy Administration was to enforce federal law, when there was sufficient evidence of a breakdown in local law enforcement so as to threaten federal rights, including rights guaranteed by the Constitution and statutes that forbid attacks on interstate movement. (Deposition, p 6.) This policy was further enunciated in a statement by Attorney General Kennedy, on May 24, 1961:

> The Federal Government's responsibility is quite clear in this situation. Our obligation is to protect interstate travelers and maintain law and order only when local authorities are unable or unwilling to do so. (White Deposition, Exhibit 11.)

This declaration reiterated the Attorney General's intentions expressed in his May 6 address to the University of Georgia that the Justice Department would vigorously enforce the civil rights statutes and laws of the United States. This policy, however, was not implemented on or before May 14, since the FBI did not inform White or anyone in the Department of Justice of the conspiracy by the KKK and the Alabama police officials to disrupt and to attack the Freedom Riders. (White Deposition, pp. 16–17.) The lapse of time before the relevant facts were made known to the Department of Justice was critical, considering Justice White's testimony:

> Q If you had known prior to May 14 when the Birmingham depot attack took place that the attack was going to take place, that the city authority and the Klan were working together, that the

FBI had an informant who was not only doing—was not only working in the Klan but meeting with the police and that that informant, Gary Rowe, was reporting all of this to the FBI so that the FBI knew that this attack was going to take place without any police protection. If these facts had been called to your attention, would you have taken action to protect the Freedom Riders?

> \* \* \* \* \* \*

> A I would ask the FBI why they didn't arrest some people.

> \* \* \* \* \* \*

> A I think they probably should have arrested somebody. I probably would have suggested that they did.

> \* \* \* \* \* \*

> A If those are the facts and they knew it, then something should have happened that didn't, but I don't know what they did. (Deposition, pp. 27–28.)

With regard to the FBI's failure to make an arrest under the circumstances of this case, Justice White declared:

> ... I would suppose that if a person who has taken an oath to enforce the law and has the duty of an FBI agent, if he knew that people are in an agreement—a public official and some private parties were in agreement to attack some people moving in interstate commerce or deprive them of their Federal rights, he actually knew those facts, he ought to—he ought to—he would have probable cause to make an arrest; and if he—if he didn't, *he isn't performing his duty.* But I don't easily assume that people don't perform their duties, as an agent of the FBI or anybody else. If they didn't make an arrest or take some effective action in the situation, there was some reason at least that that particular official or officials— that was an adequate reason for not taking that action. Now, I don't know what that reason was. *Otherwise they are shirking their responsibilities or they are in cahoots with the conspirators....* (*Id.* pp. 29–30; emphasis supplied.)

Justice White later reiterated that, under the factual context of the case, the FBI was not performing its duty. (*Id.* at p. 30.) Moreover, White stated that if the local and state officials could not be counted on to perform their obligations, then that would have been "more reason than ever to make some arrests," even though, "you are going to have to surface your informant." (*Id.* at 35.) Not only were arrests a possibility, but Justice White explained that other courses of action should have been followed:

> I would have called up, I suppose, Mr. Connor and said, we have this report or said, look, these people are here and you know it is a Federal crime to do so and so and we don't have a national police force but—and we are not equipped to enforce the law like that from day to day. But we certainly expect you to and *we will be on hand.* (p. 12; emphasis supplied.)

Indeed, Burke Marshall, Assistant Attorney General in charge of the Civil Rights Division, testified that if the Department of Justice had known of the conspiracy prior to May 14, 1961 some action would have been taken to prevent the carrying out of the conspiracy and the violence which erupted. (Plaintiffs' Exhibit 243, p. 98.) Marshall also testified that arrests were a possibility under the circumstances. (Plaintiffs' Exhibit 243, p. 126.) Marshall pursued this possibility, when on May 18, 1961 he wrote to the Director of the FBI to inform the Bureau that the Civil Rights Division would assume jurisdiction over all possible violations of the federal law arising out of the incidents in Birmingham and Anniston on May 14, 1961. He instructed the FBI· to investigate both incidents for possible violations of 18 U.S.C. §§ 241 and 242 and to investigate whether local law enforcement officials had deliberately withheld protection from the Freedom Riders. (Plaintiffs' Exhibit 83.)

Marshall testified about several alternative courses of action ·which could have been undertaken to thwart the conspiracy; including sending FBI agents to the scene with cameras to observe and to make the agents' presence known to the conspirators (Plaintiffs' Exhibit 243, p. 99); putting the local and state authorities on formal notice from the Department of Justice by advising them of the information the Department had obtained and what the Department felt the authorities' responsibilities were (*Id.*); physically intervening to prevent the violence when the local and state forces indicated that nothing would be done on their part (*Id.* at 100); informing local leaders in the community of the knowledge gained by the Bureau (*Id.* at 99); and pressuring local and state authorities to carry out their responsibilities because if the duly constituted officials did not meet those responsibilities, "the federal government would." (*Id.* at 100, 129.)

Marshall observed that the FBI should have speeded up its operations in urgent matters such as this. (*Id.* at 102.) In any event, he expected the Bureau to turn over information to the Department in advance if it had knowledge of particular violations of civil rights deprivations involving violence (*Id.* at 113). In this regard Marshall stated that it was easier for the federal government to take steps to prevent an outbreak of violence than to try to stop it once it had occurred. (*Id.* at 127.) Similar to the declaration of Justice White, Marshall commented upon the role of the federal government under the circumstances which befell the Freedom Riders:

> If there was sufficient evidence of a likelihood of violence in such magnitude that the state authorities would be unable to protect—provide protection to the people in the state, I suppose that a state of insurrection would exist and the federal government would be empowered to act and *would have the responsibility to act.* (*Id.* at 134; emphasis supplied.)

Not only did these Department of Justice officials believe, under the circumstances that a conspiracy to deprive the Freedom Riders of their constitutional rights existed, and that the FBI did not perform its duty by failing to prevent the conspiracy from going forward, but SAC Jenkins of the Birmingham field office also believed that the

right to travel interstate, if interfered with, was a federal offense:

Q. Quite right. And that violence would be directed against the Freedom Riders, because they were exercising their right to travel, correct?

A. Yes.

Q. All right. Now, the exercise of the right to travel, if it is interfered with, is a federal offense, under the Civil Rights Act, isn't it?

A. Yes.

Q. So that if you had sent—if you had yourself gone to the Trailways terminal, you would have been able to observe the commission of a federal offense, right?

A. Possibly.

Q. All right. And if you had gone there and you had observed, as Mr. Peck and others came off the bus, a physical attack on them, pursuant to the policy which your informants had revealed to you, and the plans which your informants had revealed to you, you could have physically intervened could you not?

A. No.

Q. Will you tell us why you couldn't have physically intervened to protect people being injured?

A. Because the FBI is not a protective agency. It's an investigative agency.

Q. But if the FBI observes a felony being committed in its presence, you know that the FBI has power to make an arrest, do you not?

\* \* \* \* \* \*

A. With the authority of the Civil Rights Division of the Department.

Q. No, Mr. Jenkins, if you as an FBI agent observe a crime being committed, you have the authority, do you not, as an FBI agent, much less a Special Agent in Charge, to arrest the violators—those who are committing a federal crime. You could do that when you see a crime being committed, can't you?

A. Yes.

\* \* \* \* \* \*

Q. And so you could have made the arrest of the people beating up the Freedom Riders, if you had decided that it was proper for you to be there.

A. If it had—if I had reason to believe that it was a violation of the Civil Rights statute.

Q. Correct, correct. Now, you had the documents in your possession. You had the reports by Mr. Rowe. So you knew that the violence was going to occur, because people had exercised their right to travel, didn't you?

A. Well, I don't know whether it was exercising their right to travel. I don't think they were interfering with their right to travel, as they were to interfere with them using the facilities. (Plaintiffs' Exhibit 239 pp. 788–790, Jenkins Testimony in *Peck v. United States.*)

In May 1961, the government, recognized that it had a duty to act, when it filed the Complaint in *United States v. United States Klans,* 194 F.Supp. 897 (MD Ala.1961). There the government sought to enjoin members of the Klan and certain state officials from conspiring to interfere with or intimidate interstate travelers, premising its action on the events in Anniston and Birmingham. The Complaint alleged:

> The [United States], *having an interest in the movement of interstate commerce free from unlawful obstruction or interference, and having a duty to remove any such obstruction or interference when it occurs,* will suffer immediate and irreparable injury from the acts, conduct and conspiracy of the defendants as herein alleged, and plaintiff has no adequate remedy against such injury other than this action for an injunction. (Emphasis supplied.) (Complaint, Paragraph 36.)

The position of the government set forth above explicitly recognizes that the United States had a duty to remove any obstructions or interference with interstate commerce, including interference with commerce resulting from the violence which occurred on May 14, 1961 in Anniston and Birmingham. *United States v. United States Klans,* 194 F.Supp. at 901–902.

 In the absence of a federal statute, there is no legally enforceable duty on the part of the federal government to warn the victims of criminal activity. *Redmond v. United States*, 518 F.2d 811 (CA 7 1975). *See also, Peck v. United States*, 470 F.Supp. 1003, 1017 (SD N.Y.1979). Not at issue, notably, is whether the government had a duty to investigate, carefully or otherwise, threatened or actual violations of the federal criminal law. It is not that the FBI was compelled to investigate the activities of the conspirators once they had knowledge of a crime under 18 U.S.C. § 241, § 371, or § 242, since the FBI had already detected a violation of one or more of those sections. Instead, the issue is whether the government had a duty under 28 U.S.C. § 533 to timely inform the competent prosecutorial authorities in the Department of Justice of those violations, where the FBI's informant assisted in the execution of the conspiracy and was instrumental in the planning of that conspiracy; or whether the FBI could allow that informant to participate in the lawlessness, and turn its back upon the violations it had detected. In this respect the circumstances of this case set it clearly apart from cases where the concern is simply the issue of a general duty to protect citizens from criminal activity.

### Opportunities Foreclosed

Not only did the FBI's failure to timely inform the Department of Justice of the conspiracy prevent that Department from initiating appropriate action, but the failure also foreclosed the president from reacting to prevent the beatings. Pursuant to § 333 of Chapter 15 of Title 10 of the United States Code, the President of the United States can take such measures, including using the militia or armed forces [13], as he considers necessary to suppress, in a state, any unlawful combination or conspiracy, if it:

... (1) so hinders the execution of the laws of that State, and of the United States within the State, that any part or

class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law, and *the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection;* or (2) opposes or obstructs the execution of the laws of the United States or impedes the course of justice under those laws.

In any situation covered by clause (1), the State shall be considered to have denied the equal protection of the laws secured by the Constitution. (Emphasis supplied.)

 The right to travel interstate falls within the ambit of protection offered by §§ 333 and 332. Senator Borah commented on § 333 in 1937:

... in order that the President may have authority to proceed under that section it would have to be shown that rights, privileges, and immunities guaranteed by the Constitution of the United States or some law of the United States had been infringed or broken or violated.... If the national rights of the citizens, if the the national immunities and the national privileges of the citizen as guaranteed by the Constitution are interferred with, the National Government does not have to wait upon the government of the State. Cong.Rec. 75th Cong. 1st Sess. Vol. 81 Part III, p. 3063.

Because the right to travel interstate is a basic fundamental right of national citizenship it, consequently, is protected by § 333 of Title 10. In fact, § 333 was utilized by President Kennedy and other presidents.

President Grant, under the authority of the original Act, sent troops into several counties of South Carolina in 1871 to suppress the Ku Klux Klan. Wilson's Doc. 263, 67 Cong.2d Sess. p. 103. President Eisenhower relied on § 332 to issue Executive Order No. 10730 on September 24, 1957, which ordered into active military service

---

**13.** Section 332 of Title 10 also empowers the President to use the armed forces to prevent "unlawful obstruction, combinations or assemblages," which make it impracticable to enforce the laws of the United States.

units of the National Guard within the State of Arkansas. Those units were ordered to remove any obstructions to justice with regard to enrollment and attendance at public schools in the Little Rock School District, Little Rock, Arkansas. Indeed, following May 14, 1961, President Kennedy utilized his power under these sections on four occasions: first, on September 30, 1962 when he ordered the National Guard to remove all obstructions of justice in the State of Mississippi, Executive Order No. 11053; second, on June 11, 1963 when he directed the National Guard to remove obstructions of justice and to suppress unlawful assemblies, conspiracies, and domestic violence which oppose the laws of the United States or impede the cause of justice in Alabama, Executive Order No. 11111; third, on September 10, 1963 the President ordered the National Guard in Alabama to enforce the orders of the United States courts relating to the enrollment and attendance of students in public schools in the State of Alabama and to suppress unlawful assemblies, conspiracies and domestic violence, and; on May 18, 1961 the President in response to the violence in Anniston and Birmingham directed the Secretary of Defense to use the Armed Forces to quell the domestic violence in Alabama and remove those obstructions constituting a denial of the equal protection of the laws. The President proclaimed:

> WHEREAS, certain persons in the State of Alabama, individually and in unlawful assemblages, combinations, and conspiracies, have obstructed and so hindered the execution of the laws of that State, and of the United States within that State, that a group of citizens of the United States have been deprived of their rights, privileges, immunities and protections named in the Constitution and secured by law, and the constituted authorities of that State are unable, fail, or refuse to protect such rights, privileges and immunities, particularly at Birmingham, Alabama; and

> WHEREAS, such obstruction constitutes a denial of the equal protection of the laws secured by the Constitution of the United States and impedes the course of law and order; and

> WHEREAS, domestic violence has and is occurring in the State of Alabama which obstructs the execution of the laws of the United States and impedes the course of justice under those laws; and

> WHEREAS, such obstruction of justice hinders the execution of the laws of that State and of the United States, and makes it impracticable to enforce such laws by the ordinary course of judicial proceedings:

> NOW, THEREFORE, I, John F. Kennedy, President of the United States, under and by virtue of the authority vested in me by the Constitution and Statutes of the United States, including Chapter 15 of Title 10 of the United States Code, particularly Sections 332 and 333 thereof, do command all persons engaged in such obstruction of justice to cease and desist therefrom, and to disperse forthwith. (Plaintiffs' Exhibit 244.)

▬ However, before Presidents Kennedy, Eisenhower, and Grant could act, they were presented, not with a request for assistance by a state, which is not needed to invoke the Act, but with "sufficient evidence of specific facts sufficient to sustain the judgment by the President that the condition described in (§ 333) exists." Papers Relative to Labor Troubles at Goldfield, Nevada, H.Doc. 607, 60th Cong. 1st Sess. p. 697. Here, President Kennedy could not have possibly formed a judgment on whether to implement the protections of § 333 to prevent the violent conspiracy in Alabama since he was not timely apprised of the unlawful conspiracy by the FBI. Whether he would have acted will never be known, but his utilization of § 333 four days after the violence is powerful evidence of such an inclination. The FBI, however, foreclosed this preventative option.[14] It

---

**14.** The FBI also foreclosed another basis for presidential action stemming from *Cunningham v. Neagle,* 135 U.S. 1, 69, 10 S.Ct. 658, 670, 34 L.Ed. 55 (1890), where the Supreme Court said that "there is a peace of the United States." The court recognized that the presi-

may also never be revealed whether the FBI failed to act in conscious disregard of the President's options, or was merely negligent in its duties.

### The Duty to Maintain Law and Order and Negligence Per Se

In *Redmond v. United States, supra,* a complaint against the United States, filed under the Federal Tort Claims Act, charged that employees, agents and operatives of the Securities and Exchange Commission, Secret Service and Treasury Department permitted the plaintiff to be defrauded by a confidence man. The Southern District of Indiana dismissed the action for lack of subject matter jurisdiction and the plaintiff appealed. The Seventh Circuit held that allegations of the Complaint charged misrepresentation, rather than mere negligence, and thus the plaintiff's cause of action was barred from coverage under the Federal Tort Claims Act, by 28 U.S.C. § 2680(h). In so holding, the Seventh Circuit stated:

> Finally, Redmond, a putative victim of crime, seeks here to recover his losses from the Government for its failure to warn him of Wuensche's criminal activities and propensities. Redmond in essence is thus contending that the Government owed him an actionable duty to protect him, by a suitable warning, from Wuensche's criminal conduct. But does the Government have such an actionable duty? We think not. Redmond has cited no case,—and we know of none,—which holds that in the absence of statute there is a legally-enforceable duty on the part of the Government to warn or to compensate victims of criminal activity. Courts have consistently rejected the contention that, absent legislation, either the national government or the state government may be held liable for damages resulting

from criminal conduct. *See, e.g., Turner v. United States,* 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919), where Turner filed a petition in the Court of Claims against the Creek Nation of Indians and the United States as trustee of Creek funds, to recover damages for the destruction of personal property and the loss of pasture land caused by mob violence. Unanimously holding that Turner had no cause of action, the Court explained its decision in part as follows:

>> The claimant contends that, by the general law, the Creek Nation is liable in damages for the action of the mob which resulted in the destruction of his property...

>> *First.* No such liability existed by the general law.... Like other governments, municipal as well as state, the Creek Nation was free from liability for injuries to persons or property due to mob violence or failure to keep the peace. [Citations omitted.] Such liability is frequently imposed by statute upon cities and counties [Citations omitted.]; ... The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its officers to keep the peace. 248 U.S. at 357–358, 39 S.Ct. at 110.

> *It cannot be denied that the Government has a duty to maintain law and order, but how best to fulfill this duty is wholly within the discretion of its officers,* and § 2680(a) excepts from the Act both discretionary functions and discretionary duties. *United States v. Faneca,* 332 F.2d 872, 875 (5th Cir.1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268. *Id* 518 F.2d at 816–817. (Emphasis supplied.)

dent's duty to ensure that the laws are faithfully executed is not limited to the enforcement of acts of Congress or of statutes to the United States according to their express terms, but includes the rights, duties, and obligations growing out of the Constitution itself, our international relations and all the protection implied

by the nature of our constitutional government. The President, therefore, under this aggregate of power could have intervened to protect the rights of the Freedom Riders. Unfortunately, he was not allowed to do so because of the failure of the FBI to inform the Department of Justice of the conspiracy.

In the case *sub judice,* Plaintiffs were not deprived of their rights by virtue of spontaneous mob violence, riot or insurrection or by the United States government's failure to keep the peace under those circumstances. Rather, the Plaintiffs were beaten pursuant to a carefully planned, orchestrated and executed scheme, formulated well in advance of the actual beatings—a plan of which the FBI was well aware prior to its implementation and which the FBI's informant helped to execute.

■ Additionally, unlike *Redmond* where a statute was not at issue, 28 U.S.C. § 533 describes the duty of the FBI to maintain law and order, i.e., not only to investigate, but to prosecute federal crimes. The statute implies an affirmative duty to transmit the detection of federal crime to the Department of Justice. This duty is especially applicable to this case where the FBI's informants were involved in the criminal activity. Title 28 U.S.C. § 533 clearly did not contemplate and was, in fact, designed to prohibit, the condoning of criminal activity by failing to carry out this statutory duty. Language similar to 28 U.S.C. § 533 has appeared in legislation relating to the Office of the Attorney General since that was established as part of the executive department of the United States government. Nowhere in the history of that legislation does it provide that the government may sit idly by when a federal crime has been detected and when an operative of the government has immersed himself and an executive department of the United States government into an illegal scheme.

The Department of Justice was established to ensure that this nation is governed by the rule of law and not by fiat, that justice is preserved and observed. Title 28 U.S.C. § 533 was enacted to achieve those purposes, to benefit the nation's citizens, and to protect them from the tyranny of the unjust. When the government disregards the directives of the statute, either through omission or commission, and allows itself to become embroiled in a lawless scheme and then does nothing to prevent

that scheme from injuring innocent citizens, it is joining the forces of the unjust in contravention of the majestic purposes which underscore this nation's system of justice.

■ The Bureau had a duty to undertake action which would uphold the laws of the United States and prevent those laws from being violated, where the Bureau had become, by its direction of its informants, involved in a conspiracy to deprive the Freedom Riders of their constitutional rights. Instead, the FBI did nothing to prevent the crime from being carried to its logical end. Thus, the government, through the FBI, violated its duty under 28 U.S.C. § 533.

In formulating this analysis I had occasion to consider, at great length, the nature of the FBI, and its functions. The protection of personal liberties has long been thought to outweigh the danger of less effective law enforcement which may be occasioned by fear of personal tort liability. *Bivens v. Six Unknown Named Agents,* 456 F.2d 1339, 1346 (CA 2 1972). As the Sixth Circuit has observed, "the prospect of governmental liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law." *Downs v. United States,* 522 F.2d 990, 998 (CA 6 1975). Unfortunately, in the case at bar the government did not vigorously enforce the law as enforcement was contemplated by Attorney General Kennedy when he made his University of Georgia address on May 6, 1961. Thus the government failed to remove itself from the lawless scheme to assault the Freedom Riders and to deprive them of their constitutional rights.

### The Duty to Maintain Law and Order is Not a Discretionary Function

The government, however, contends that its duty to maintain law and order is a discretionary function as defined by *Redmond, supra,* and is thus excepted from the Federal Tort Claims Act subject matter jurisdiction of this Court. The burden of establishing this exception is upon the

government. *Carlyle v. United States,* 674 F.2d 554, 556 (CA 6 1982). Title 28 U.S.C. § 2680(a) provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused.

Upon consideration, I am of the opinion that this exception is inapplicable to the facts of the case at bar. The seminal decision of the Sixth Circuit considering the discretionary function exception is *Downs v. United States, supra,* wherein the survivors of two victims of an airline hijacking brought suit against the United States under the Federal Tort Claims Act to recover damages on the ground that the chief FBI agent had been negligent in handling the hijacking and had thereby caused the deaths. The Court of Appeals held the agents' handling of the situation did not fall within the discretionary function exception to the Act, and in doing so opined:

We recognize that the agent was called upon to use judgment in dealing with the hijacking. Judgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees. ... If exercise of judgment were the standard for applying the discretionary function exception, a host of cases have been wrongly decided. These cases would include *Indian Towing Co., Inc. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (failure to replace a burned-out lamp in a lighthouse); *Rayonier, Incorporated v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (failure completely to extinguish intermittently smoldering matter following a forest fire); *Underwood v. United States,* 356 F.2d 92 (5th Cir.1966) (decision of psychiatrists to release airman from mental hospital and to provide him

access to weapons), and *Fair v. United States,* 234 F.2d at 288 (5th Cir.1956) (decision to release homicidal patient). 522 F.2d at 995. (Footnote omitted.)

The *Downs* court reviewed the language of the exception, the provision's legislative history and the application of the section by the courts to conclude:

In our view, the first part of this section immunizes the Government from liability for the actions of a Government employee who is exercising due care in implementing a government policy as set forth in a statute or regulation. The second part of the provision, the discretionary function exception, immunizes Government employees while they are formulating policy. *Id* at 996.

The Court explained that discretionary acts of officials at the planning level have been regarded as being within the discretionary function, and that discretionary acts of operational level officials have been regarded as outside the exception, the distinction being based upon the status of the official making the judgment. However, *Downs* decided that the ultimate question is whether the judgment of a government employee is of "the nature and quality" which Congress intended to put beyond judicial review. *Id* at 997, citing *Smith v. United States,* 375 F.2d 243, 246 (CA 5 1967) *cert. den.,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). The Sixth Circuit reasoned that Congress intended discretionary functions to encompass those activities which entail formulation of governmental policy, whatever the rank of those so engaged. In applying this analysis the *Downs* court wrote:

In this case, the FBI agents were not involved in formulating governmental policy. Rather, the chief agent was engaged in directing the actions of other Government agents in the handling of a particular situation. FBI hijacking policy was not being set as an *ad hoc* or exemplary matter since it had been formulated before this hijacking. Hijacking policy had previously been promulgated in the FBI Handbook and in a memorandum

jointly issued by the Departments of Transportation and Justice. While the Government's guidelines for dealing with hijacking are secret and must remain so, we note that Special Agent O'Connor was not making policy in responding to this particular situation. 522 F.2d at 997.

Likewise, in the instant case, the FBI was not involved in formulating governmental policy. While the government has a duty to maintain law and order, the question of how best to fulfill this duty is discretionary within the meaning of § 2680(a) if and only if the formulation of governmental policy is at issue.[15] As already discussed, the FBI should have and may in fact have recognized that one or more federal crimes had been detected. A full report to the Justice Department, or decision to arrest the conspirators or to undertake other courses of action would not have required an expansion of federal law and thus a formulation of policy, as the government contends. Indeed, the failure of the FBI to transmit the information concerning the conspiracy to the Department of Justice, prior to May 14, 1961, cannot be found to be based upon the implementation of any new policy. Rather, it was in disregard of existing policy, since FBI Section Chief C.L. McGowan indicated that information concerning circumstances like the conspiracy at issue should have been brought to the attention of the Department of Justice immediately. (McGowan Deposition, p. 47.) That was not done by Bureau employees in this case. Further, the fact that the FBI's Manual of Instruction and Handbook for Special Agents were silent with regard to enforcing the right to travel interstate, cannot serve to exculpate the Bureau's inaction, since that silence was in complete disregard of stated Department of Justice and FBI policy, and ignored federal law as it existed at that time.

 The government urges that the decision to inform the Birmingham police of the impending violence, in general terms so as not to violate its duty to protect the informant, is sufficient reason to invoke the discretionary function exception in this case. This argument ignores the factual context of this case. First, the government asserts that the Birmingham police were notified, in general terms, through Headquarters Section Chief C.L. McGowan, that violence was possible upon the arrival of the Freedom Riders in Birmingham. The government further submits that this course of action sought to deter the violence and is consistent with the recommendations of Plaintiffs' expert Robert J. DiGrazia. However, DiGrazia opined that full disclosure of knowledge of the involvement of the conspirators to those involved would be the only effective way to prevent the violence if this option was employed. Here, after being informed that the Birmingham Police Department would allow the incident to occur, Section Chief McGowan told Jenkins that the Birmingham Police Department should be alerted, in a manner consistent with DiGrazia's recommended course of action:

Q You were concerned, were you not, because part of the information you had indicated that the Birmingham Police Department was going to allow this activity to happen?

A I was concerned that anybody, individual or property, might be damaged down there.

Q Mr. McGowan, wasn't this of greater concern to you because there was information you had that the police were going to allow this to happen?

A All of it was of concern to me, sir. That's why I called down there and told them, "Don't sit on it. You've got to disseminate it *even if it blows your informant.* You've got to disseminate it."

Q So, this information was important enough that even if it meant people being able to figure out who the informant was, that that was a risk you were willing to take?

---

**15.** The Seventh Circuit in *Redmond v. United States, supra,* concluded in general terms that the question of how best to fulfill the duty to maintain law and order, is discretionary. In this Circuit, however, I must apply the test enunciated in *Downs* to the specific facts, in order to determine if a discretionary function is involved.

A Yes, sir. *Protection of the individuals riding that bus was more important than saving one informant.* (Deposition of December 28, 1982, p. 38.) (Emphasis supplied.)

The Section Chief instructed Jenkins to tell Police Chief Moore about the activities planned for Mother's Day and in a response was told that Birmingham was not going to advise the police department because, "they were afraid it was set up to trap their informant. We told them 'regardless of that, you've got to tell them there is a possibility of violence. You've got to alert them of that.'" (McGowan Deposition, p. 59.) Full disclosure of the parameters of the conspiracy was not made to Chief Moore.[16] The government is, therefore, mistaken in its contention that the FBI's action comported with the recommendations of the expert witness.

Even if the knowledge of the FBI was transmitted in general terms to protect its informant, the FBI in the instant matter was not formulating policy when determining how to handle its informants, but rather was exercising judgment in a discrete situation, and did not intend to guide the actions of other government officials faced with similar situations. *See Liuzzo v. United States,* 508 F.Supp. 923, 932 (ED Mich. 1981). Indeed, Justice White characterized the action of the FBI in not informing the Civil Rights Division of the conspiracy, as a matter of judgment as opposed to discretion. (White Deposition, p. 15.) In summary, the government's assertion that the Plaintiffs' claims are barred by the discretionary function exception to the Federal Tort Claims Act, is without merit.

### Breach of Defendants' 28 U.S.C. § 533 Duty

 Pursuant to *Schindler,* not only may a federal statute be relevant in defining the scope of an undertaking of the United States, but it may also be relevant in assessing the second element of a FTCA cause of action, if under state law criteria, it may be considered the kind of statute or regulation violation of which is negligence *per se.* The elements of negligence *per se* under Alabama law are set forth in *Fox v. Bartholf, supra,* which recognizes that the violation of a statute can sustain a negligence *per se* cause of action. Here, I have already determined that 28 U.S.C. § 533 was enacted for the benefit of the nation's citizenry including the Plaintiffs, to protect them from the FBI condoning and participating in lawless actions. The injury which flows from a breach of that statute is the injury which results because of the FBI's engagement in such lawlessness; i.e., the natural consequences of the unjust scheme to violate the law of the United States. In the case of the Plaintiffs the injury which was contemplated by the statute is that which occurred. Finally, the FBI negligently and volitionally violated the statute by its conduct. Accordingly, the first three elements of the Alabama criteria for a negligence *per se* cause of action have been satisfied. The Court treats the element of proximate causation later in this Opinion.

### Alabama Common Law

Alabama case law provides the elements of the cause of action for tortious injury as follows:

In every action grounded upon negligence there are three essential elements to a right of recovery. First, a duty owed by the defendant to the plaintiff; second, a breach of that duty; and third, an injury to plaintiff in consequence of that breach. *Elba Wood Products, Inc. v. Brackin,* 356 So.2d 119, 122 (Ala.1978).

In *Spence v. Tuggle,* 10 Ala. 538 (1846), an action was filed pursuant to Alabama law seeking to recover damages against the sheriff of Talladega County for breach of his official duty. Plaintiff had previously obtained judgment in the amount of $700 against several individual judgment debtors, and, seeking to satisfy that judgment,

---

**16.** Even though a May 13, 1961 Memorandum by Assistant to the Director Rosen to Assistant Director Parsons implies that full disclosure was made, on the evidence as a whole, I find that full disclosure was not made. (See pp. 1386–1387, *supra.*)

deposited a *capias ad satisfaciendum* with the defendant for service and execution. When the sheriff failed to execute the writ and filed a false return on the writ, plaintiff filed his action. Defendant demurred to each count, but the court overruled the demurrers and the jury returned a verdict for the plaintiff, following which judgment was entered accordingly. On appeal after a motion for a new trial was denied, the rulings on the demurrers were upheld, and the judgment of the trial court was affirmed.

■ In Alabama, one statutory duty of a sheriff and deputies is to ferret out crime. Ala.Code of 1940, Title 54, § 5, later Ala. Code of 1975, Title 36, § 36–22–3; *See also Roberts v. State,* 258 Ala. 534, 63 So.2d 584 (1953). This duty is similar to that required of a policeman. *Jones v. Buckelew,* 247 Ala. 475, 25 So.2d 23 (1946); *Roberts v. State, supra.*

■ Since Alabama negligence law allows individuals to sue for breach of a law enforcement officer's duty and since that duty encompasses an obligation to ferret out crime, similar to the duty which this Court finds applicable to the FBI under 28 U.S.C. § 533, it follows that the Plaintiffs here can pursue a negligence claim against the government without having to satisfy all of the elements of negligence *per se.*

Section 533 of Title 28 imposes on the FBI a duty to detect and prosecute the federal crimes. As I have already concluded, the FBI did not carry out that duty and, as a consequence, breached that duty. Thus the first two elements of a common law cause of action have been established. The Court discusses the final element of proximate causation in a later section of this Opinion.

■ Applying a "reasonable" or "prudent" standard to the FBI's conduct, as opposed to finding negligence *per se,* does not alter the government's liability. It cannot be said that agents and officials of the FBI acted prudently or reasonably under the circumstances. The Department of Justice had clearly indicated that some action

should have been initiated to prevent the violence from occurring, and FBI Section Chief McGowan related that the information obtained by the FBI should have been urgently transmitted to the Justice Department. The FBI was negligent in its failure to take such action.

*Duty Based Upon an Undertaking*

The United States, in addition to its negligence under the foregoing analysis, negligently performed its undertaking to render protection to the Freedom Riders.

In *Ross v. United States,* 640 F.2d 511 (CA 5 1981), the administratrix of the estate of an airplane pilot and pilot's son, brought an action against the United States alleging that the airplane crash which had killed the decedents occurred as the result of negligence on the part of an air traffic controller who had supplied the pilot with an incorrect "Minimum Descent Altitude." In analyzing the plaintiff's negligence cause of action, the court concluded that a duty had been assumed on the part of the controller, who had taken action beyond that called for in the controller's "Procedures Manual." In finding a duty, the Fifth Circuit applied Alabama law and commented:

> Significantly, " '[i]t is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently.' " *Hartz v. United States,* 387 F.2d 870, 874 (5th Cir.1968), *quoting Ingham v. Eastern Airlines, Inc.,* 373 F.2d 227, 236 (2nd Cir.1967). *Id.* at 519.

*Ross* in effect applied the principle summarized in § 323 of the Restatement of Torts, 2d, which Alabama law recognizes:

> § 323. *Negligent Performance of Undertaking to Render Services.* One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure

to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

See for example, *Dailey v. City of Birmingham,* 378 So.2d 728 (Ala.1979); *Robinson v. Harris,* 370 So.2d 961 (Ala.1979); *United States Fidelity and Guarantee Company v. Jones,* 356 So.2d 596 (Ala.1978); *Beasley v. MacDonald Engineering Company,* 287 Ala. 189, 249 So.2d 844 (1971); *City of Prichard v. Kelley,* 386 So.2d 403 (Ala. 1980).

Two events are particularly relevant to the Court's analysis of this theory of liability. First, in a letter dated June 1, 1961 composed by Attorney General Kennedy to Congressman George Huddleston, Jr., the Attorney General clearly delineated the responsibility of the government: to maintain the safety of interstate bus transportation when the local authorities proved unwilling or unable to do so. While this letter was prepared two weeks following the events in Birmingham and Anniston, it nevertheless reflects the government's recognition of a duty with respect to the knowledge that the FBI had gained prior to the violence which occurred. Second, when Rowe informed the Birmingham FBI field office of the conspiracy to assault and injure the Freedom Riders, he was assured by that office that the FBI would not let the conspiracy attain its violent objective. Given this assurance, Rowe was told to continue his activities, even though those actions furthered the goals of the conspiracy.

The government asserts that there is no general duty to maintain the public peace and that failure to enforce the criminal law does not result in liability on public officers, or their employer, in favor of those injured by a breach of the peace. This argument, however, lacks relevance since the issue is whether the Department of Justice and the FBI had volunteered to protect the Freedom Riders from the violent conspiracy which awaited them.

█ Instead of exercising due care to ensure that the Freedom Riders and the interstate transportation system traveled by them were protected, the FBI did absolutely nothing to prevent or minimize the effects of the conspiracy. In fact, the course of action which the FBI followed served to increase the risk of harm which the Plaintiffs faced and to assist the conspirators in carrying out their criminal actions: i.e. the FBI authorized and approved the actions of its informant, Rowe, and provided critical information to Birmingham Police Sgt. Cook despite the Bureau's knowledge that Cook was intimately involved in the conspiracy and would use this information to aid that conspiracy.

Under these circumstances, I am persuaded that the government negligently performed a voluntary undertaking. Accordingly, the government is liable to the Plaintiffs for that misfeasance. *Ross, supra.*

### Private Attorneys General

In my prior Opinion on the Defendants' Motion for Summary Judgment, I left open the possibility that Plaintiffs might prove that there was a "special relationship" between themselves and the federal government giving rise to a duty which did not run to the public at large, to protect the Freedom Riders from the violence of the conspirators. Plaintiffs claim they were "testing" the reach of the United States Supreme Court's decision in *Boynton v. Virginia, supra,* by integrating interstate buses and bus terminals which they used. The Plaintiffs explained that the Freedom Rides were, by this "testing," designed to expose violations of federal law, and to force compliance with the Supreme Court's goal of desegregating such facilities. As such Plaintiffs argue that the Freedom Riders were, in essence, "private attorneys general" as that concept was articulated in *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 401–2, 88 S.Ct. 964, 965–6, 19 L.Ed.2d 1263 (1968) and its progeny. The Supreme Court indicated in *Newman:*

When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation

would have to rely in part upon private litigation as a means of securing broad compliance with the law.... [if a plaintiff obtains relief under the Act] he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. 390 U.S. at 401–402, 88 S.Ct. at 965–966.

This theory was developed in the context of attorneys fee awards for Civil Rights Act litigants. Therefore, the instant litigants do not fit within the classic mold as envisioned by *Newman*. Moreover, the decision of the Freedom Riders to force Greyhound and Trailways to comply with *Boynton* through confrontational tactics was not necessarily the approach the Kennedy administration might have encouraged.

Traditionally, the "private attorneys general" theory has been brought into play only when a special relationship has created a duty. Such a duty exists in cases involving such people as informers, government employees, witnesses, or persons to whom an express promise of some form of protection has been made. Plaintiffs claim that this relationship existed in the case at bar and is analogous to that found in *Swanner v. United States*, 275 F.Supp. 1007 (MD Ala.1967), *rev'd on other grounds*, 406 F.2d 716 (CA 5 1969) *on remand*, 309 F.Supp. 1183 (Ala.1970). *Swanner* was a suit against the federal government under the Federal Tort Claims Act for injuries and property damage sustained when a bomb exploded at a house occupied by the plaintiffs. The United States District Court for the Middle District of Alabama entered judgment for the defendant and the plaintiff appealed. The Fifth Circuit, however, reversed and remanded for a new trial. On remand, District Judge Johnson held that where a "special employee" of the United States government was in a position of danger as the result of his giving information and testifying for the government, and where the government failed to provide protection for him and his family, the injuries received by that employee and members of his family when the bomb exploded under his house, were the result of negli-

gence on the part of the government in failing to provide protection and, therefore, the government was liable to the plaintiff.

Of particular importance to that holding was the relationship which Swanner maintained with the government. For some time prior to the explosion which resulted in his lawsuit, plaintiff Swanner had been employed by the Alcohol and Tobacco Tax Division of the Internal Revenue Service as a "special employee" to aid in the undercover investigation of illicit whiskey operations in Giles County, Tennessee. As a result of information which he developed in the course of his investigation, numerous indictments were returned against several persons in and around Giles County. As a result of Swanner's role in bringing about those indictments, he incurred the enmity of many of the residents of Giles County and thus was placed in a position of danger. In rendering judgment for the plaintiff, Judge Johnson held:

> ... this court now concludes that the United States owed a special duty to use reasonable care for the protection of John C. Swanner and the members of his household. This conclusion is based upon the evidence that reflects that Swanner had corroborated and assisted the government in the arrest and prosecution of criminals and that it had reasonably appeared to the agents of the United States that Swanner, and possibly the members of his household, was endangered due to his corroboration and assistance. The law is clear that whenever there is reasonable cause to believe that a government agent or employee, or any member of his family, is endangered as the result of the performance of his duty to the government, a duty on the part of the government to protect him and the members of his family arises. This duty arises without the necessity for a formal request on the part of the person or persons endangered. It arises upon the communication to the government of facts which would create a reasonable belief that a government employee or his family, is endangered as a result of the perform-

ance of duty, and it is immaterial whether the information is received directly from those endangered or from some other source. 309 F.Supp. at 1187–1188. (Citations omitted.)

■ Contrary to the circumstances of *Swanner,* the Plaintiffs in the case at bar were not performing a duty to the government in traveling interstate to test the scope of the Supreme Court's decision in *Boynton.* While the courageous action of the Plaintiffs in undertaking such a journey is obvious, that action, nonetheless, does not rise to the level of a relationship with the government which would trigger an actionable duty within the contemplation of *Swanner.* Moreover, it cannot be said that the Plaintiffs were government employees, witnesses, or persons to whom an *express* promise of some form of protection has been made. As has been discussed previously, the United States undertook to protect the Freedom Riders from the violent plans of the conspirators. However, this voluntary undertaking was not expressly conveyed to the Plaintiffs and, thus is not the kind of promise which would obligate the government, under *Swanner.* Accordingly, having reserved judgment on this question, and after considering all the testimony and evidence in this case, I conclude that the Plaintiffs have failed to prove, by a preponderance of the evidence, that a special relationship existed which would indicate that the Plaintiffs were acting as "private attorneys general."

*The Assault and Battery Exception of the Federal Tort Claims Act*

■ Plaintiffs' Federal Tort Claims Act cause of action is not barred by the assault and battery exception to the Act found at 28 U.S.C. § 2680(h). That exception bars claims "arising out of" an assault and battery. Admittedly, the physical injuries sustained by the Plaintiffs were received via an assault. However, the assault and battery which was perpetrated upon the Freedom Riders is not the legal basis for Plaintiffs' tort cause of action against the government. Instead, their cause of action

against the United States is premised on the negligence of the FBI in responding to information it had obtained prior to May 14, 1961. While Plaintiffs suffered injury in the nature of an assault, the government's negligence lies in its failure to intercede to protect Plaintiffs' right to interstate travel and to equal protection of the law. As Judge Joiner opined in *Liuzzo v. United States, supra,* at 928–929, quoting from *Bryson v. United States,* 463 F.Supp. 908 (ED Pa.1978):

When injuries directly resulting from assaults and batteries may be reasonably alleged to have their roots in negligence, however, the courts have refused to dismiss them under section 2680(h).

Similarly here, the exception contained in § 2680(h) has no application. *Liuzzo v. United States, supra; Panella v. United States,* 216 F.2d 622 (CA 2 1954); *Gibson v. United States,* 457 F.2d 1391 (CA 3 1972); *Rogers v. United States,* 397 F.2d 12 (CA 4 1968).

*Miscellaneous Tort Issues*

■ The government contends, in its brief, that Plaintiff Walter Bergman was "only" assaulted in Anniston apparently advancing as its theory that the statewide conspiracy did not include Anniston. While the assault is not the basis of Plaintiffs' claims under the FTCA, Walter Bergman was severely beaten in Anniston and, albeit less violently, was physically assaulted in Birmingham. In addition he and Frances Bergman were both continually threatened on the ride between Anniston and Birmingham.

As discussed above, Plaintiffs' tort claim against the government is, however, premised on the government's failures with respect to denying them equal protection of the laws and permitting them to travel, peacefully, between and in the several states. The government bases its argument on a contention that it had limited information on the Anniston "reception" planned, and that, at the very worst, Plaintiffs would "merely" be denied access to the bus station's facilities. Such knowledge on the

part of the FBI, was, then admittedly, knowledge of a conspiracy to deprive Plaintiffs of their interstate travel rights.

The government's factual premise is also seriously misleading. A statewide plot existed to rid Alabama of the Freedom Riders, and Anniston was, clearly, one phase of the conspiracy. Moreover this phase was an important one in that it, at a minimum, proposed to deprive Plaintiffs of their interstate travel rights before sending them to their unpleasant destiny in Birmingham.

In its brief, the government asserts that the standard for measuring its duty should be gleaned from its own manuals, and that it acted in accordance with such materials. In support of this argument, the government cites *United Scottish Insurance Company v. United States,* 614 F.2d 188 (CA 9 1979). *Scottish Insurance,* however, simply opines that federal regulations *may* be relevant in determining duty, and not that such regulations are the *sole* criteria. *See also, Schindler, supra.* The Court has previously discussed the source of such duty, under the Federal Tort Claims Act, as appearing in the law of the state where the tortious injury occurred. Furthermore, the manuals were seriously deficient in 1961 as they failed to recognize the nature of federal criminal law under § 241 and § 242 more fully discussed under those captions in this Opinion.

 Walter Bergman's standing is attacked by Defendants, apparently again asserting that he was "only" assaulted in Anniston and should not be permitted to premise claims on the government's inaction in the Birmingham melee. However, both he and Frances Bergman were subjected to threats of imminent harm from the time of their arrival in Anniston until they left Birmingham; both were also impeded in the exercise of their right to interstate travel. The "standing" argument lacks merit.

The FBI notes that it had received no instructions from the Civil Rights Division of the Justice Department even though, it argues, it had "fully advised" that Division of the situation prior to May 12. (Trial brief, p. 42.) Absent from its analysis, however, is that the FBI failed to transmit the May 12 information to Justice until after the May 14 incidents. The most serious omission was its failure to provide the information Rowe reported on May 12. (See Plaintiffs' Exhibits 42 and 49 and this Opinion p. 1385, *supra.*)

 The government, labeling that information as unreliable, third-hand hearsay, apparently urges the Court to forgive its failure to apprise the Justice Department. However, the FBI consistently, throughout this entire period, considered Rowe reliable and, thus, relied on his information, wherever he obtained it. The May 12 information, moreover, was consistent with all the other information timely communicated. During this critical period just before the plan of the conspiracy was to be executed the FBI (1) relied on local police authorities; (2) claims now not to have relied on Rowe's information that those same authorities were involved in a criminal conspiracy; and hence (3) failed to inform Justice. Such action and inaction is, at a minimum, negligent.

Finally, attacking all Plaintiffs' negligence claims, the government contends that since no investigation was undertaken by the Civil Rights Division after the "awful reality," there can be no negligence in Headquarters handling of the reported information. (Trial brief, p. 43.) Such an assertion overlooks Assistant Attorney General Marshall's directive *instructing* the Bureau to investigate both the Anniston and Birmingham incidents for possible violations of 18 U.S.C. §§ 241 and 242.

*Proximate Cause*

 It is well settled under Alabama law that a cause of action for tortious injury requires; not only the existence of a duty and a breach of that duty, but also that the conduct constituting that breach of duty was a proximate cause of the Plaintiffs' injuries. *Fox v. Bartholf, supra; Elba Wood Products, Inc. v. Brackin, supra,* 356 So.2d at 122 (Ala.1978). To be a proximate

cause of injury under Alabama law, "a negligent act must have been the 'primary moving cause without which [the injury] would not have occurred....'" *Ross v. United States, supra* 640 F.2d at 519, quoting from *City of Mobile v. Havard,* 289 Ala. 532, 268 So.2d 805, 810 (1972). Under this standard, the causal relationship between the government's negligent acts and omissions and the injuries which Plaintiffs suffered is apparent by a preponderance of the evidence.

 As noted above, the government contends that the Plaintiffs have demonstrated only that Plaintiff Walter Bergman was assaulted in Anniston, and that Plaintiffs therefore failed to establish a connection between that assault and the Defendant United States. The Defendant reasons that Plaintiffs are thus left solely with their contention that "among the information [the Plaintiffs] don't have, by reason of the government's refusal to disclose information which would reveal informants' identities, is information that the United States had some inkling that the assault at Anniston would take place." (Trial brief, p. 46.) Of course, the Court has concluded, *without* reference to the undisclosed materials and documentation, that the United States knew that the conspiracy was statewide and that violence was expected in Anniston. I note also the government's own conclusion that, "only if there were a duty affirmatively to act upon the information that the United States had can it be said that failure so to act proximately caused the Plaintiff's injuries. (Trial brief, 46–47.) An affirmative duty to act on the information, to prevent the conspiracy from reaching fruition and to protect the Freedom Riders, did exist; thus by the government's own analysis its failure to so act proximately caused Plaintiffs' injuries.

My own analysis leads me to the same conclusion. Under the circumstances of the case which existed, on May 14, 1961, it was reasonable for the government to see that, absent federal intervention, the conspiracy against the Freedom Riders would proceed and the Riders would be threatened, beaten and injured. The FBI had specific information from a number of sources concerning the nature of the conspiracy. As Justice White testified, the FBI with its knowledge of local law enforcement complicity could have attempted to prevent the beatings by simply alerting these authorities that the FBI knew the depth and extent of their involvement. (Deposition, p. 12.) And as the testimony of Plaintiffs' expert, Robert DiGrazia, revealed, this course of action very well could have prevented the beatings. Additionally, Assistant Attorney General Marshall, who was in charge of the Civil Rights Division, indicated that had he known of the violence that was planned, some action would have been taken to prevent it. (Marshall Deposition, pp. 98–99.) He would have recommended various courses of action which the government might have pursued, including having agents at the scene of the bus terminals; putting local and state authorities on formal notice of the information which the Bureau had received; and also, if necessary, making arrests.

When on May 15 the Freedom Riders were forced to leave Birmingham from the airport, the Birmingham police were able to restrain an angry mob from attacking the Riders. This protection was offered because of the high degree of publicity the previous days' events had generated and because the FBI was by then present. Violence had also been avoided in an April, 1961 experience when the FBI informed Birmingham Police Sgt. Cook that the FBI knew of a KKK plan to attack a poet, John Ciordi. When the Klan and its sympathizers learned that the FBI was aware of their plans, they backed down. Finally, even by the sole action of State Trooper Cowling on the Greyhound bus that was burned outside Anniston, serious and life threatening injury to the Freedom Riders was prevented. Surely, if Cowling in his individual capacity was able to prevent such injuries, the FBI with its abundant resources would have proven to be effective against the conspirators.

For all the foregoing reasons, I conclude that the United States' failure to carry out its duties was a primary moving cause without which the physical injuries to the Freedom Riders would not have occurred. Moreover, the Plaintiffs suffered not only physical injury but also injury in the sense that they were deprived of the equal protection of the laws and their right to travel freely interstate. Such injury to the Plaintiffs' rights also resulted because of the government's breach of duty. Thus, the Plaintiffs have proven by a preponderance of the evidence that, under Alabama law, the acts of the United States were a proximate cause of their injuries.

### Contributory Negligence and Assumption of the Risk

The government has raised the defense of contributory negligence on the part of the Plaintiffs. Under Alabama law:

> ... it is well established that a plaintiff in a negligence case cannot recover notwithstanding that he may have proven negligence on the part of the defendant, where plaintiff's own negligence is shown by his or the defendant's proof to have proximately contributed to his damage, provided such contributory negligence is specially pleaded....

*Alabama Power Company v. Scholz,* 283 Ala. 232, 215 So.2d 447, 452 (Ala.1968). The Supreme Court of Alabama has stated that a party is contributorily negligent when that party: (1) had knowledge of the condition or failure, (2) appreciated the danger and (3) failed to exercise reasonable care in the premises, but with such knowledge and appreciation, put himself into the way of danger. *Alabama Power Company v. Mosley,* 294 Ala. 394, 318 So.2d 260, 263 (1975).

■ There is no evidence that Plaintiffs knew that a statewide conspiracy to harm the Freedom Riders existed between Alabama police officials and the KKK. They were unaware that mobs awaited them in Anniston and Birmingham that local police had agreed to be absent from the scene at the Birmingham bus depot. The Freedom Riders did not know that the FBI was fully aware of the planned violence or that an FBI informant would be among the attackers; nor did the Freedom Riders have any reason to believe that given this knowledge and involvement, the FBI would not assist in protecting them. In sum, Plaintiffs did not know that they would be left totally unprotected.

Since the Freedom Riders had no knowledge of these circumstances, they could not have appreciated the nature or extent of the danger which awaited them. Nor can it be said that the Plaintiffs failed to exercise reasonable care. The Freedom Riders did nothing to cause their injuries, except legally and peacefully use the interstate bus system. I find no contributory negligence in Plaintiffs' non-violent "testing" of their federal rights.

■ The government argues, however, that the Plaintiffs assumed a risk which placed them in the way of a known danger, thereby barring the Plaintiffs from holding the government liable for their injuries. Assumption of the risk is a complete defense to actions for personal injury in Alabama. *Nelms v. Allied Mills Company,* 387 So.2d 152, 156 (Ala.1980). To establish this defense a plaintiff must be shown to have had knowledge and appreciation of the danger assumed and thereupon put himself voluntarily in the way of that danger. *Kemp v. Jackson,* 274 Ala. 29, 145 So.2d 187, 191 (1962); *Employers Casualty Company v. Hagendorfer,* 393 So.2d 999, 1001 (Ala.1981).

■ While Plaintiffs Walter and Frances Bergman were familiar with the conditions in the South in 1961 they could not and did not expect to incur the type and magnitude of the violence which befell them. They did, of course, assume a certain degree of risk by the very nature of their rides into the South. They recognized that they would probably encounter hostility. In fact, prior to the trip they had been trained to be on guard, and had been instructed in non-violent self-defense tactics. They had encountered minor incidents of violence before they reached Alabama.

And they were aware of the reputation of Commissioner Connor from past news releases. In Atlanta, one of the Freedom Riders may have been advised by a telephone call from the Rev. Shuttlesworth, that the KKK was planning a "reception" for them in Birmingham. Neither Plaintiff nor the other Freedom Riders who testified remembered learning of such information. There was testimony that on the bus between Atlanta and Birmingham a passenger warned the Riders that they would be "taken care of" in Alabama. Walter Bergman testified that the only danger he perceived, in advance, was that overly "zealous" local law enforcement officers might rough up the Freedom Riders in arresting them.

As noted above, Plaintiffs did *not* have knowledge of facts about the statewide conspiracy and official involvement in the plan for violence. Plaintiffs thus never assumed the risk which they actually encountered: a violent mob purposely unrestrained by local law enforcement, coupled with the lack of any protection or intervention from the federal government.

Based on the foregoing, the Court will issue a Judgment for the Plaintiffs following its resolution of the damage issue.

\* \* \* \* \* \*

Unequal laws unto a savage race... I cannot rest from travel ... all times I have enjoy'd Greatly, have suffered greatly...
Come, my friends, 'tis not too late to seek a newer world....
Tho' much is taken, much abides; and tho' we are not now the strength which in old days moved earth and heaven; that which we are, we are; one equal temper of heroic hearts, made weak by time and fate, but stronger in will. To strive, to seek, to find, and not to yield.
Alfred Tennyson, "Ulysses," *Tennyson's Poems.* Boston: Tickner & Fields, 1868.

More than a hundred years before Robert Francis Kennedy spoke of the law to the Georgia students, Tennyson had addressed himself to the law, and judged it "unequal." Kennedy, by contrast, had proclaimed that the express law of the United States was not only equal, but equally administered. While drafting this Opinion, I was reminded of both men and their views. Law Day audiences should remember that the law is always evolving; when inequality is apparent, people of courage and foresight will always "seek a newer world."

America has long been plagued by the awful vestiges of its institution of human slavery. The American Civil War was fought, in large part, because of the depth of feelings produced by the enslavement of a people. The Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution were added to put an end to the inequality to Black Americans, as well as abolish the institution of slavery. When it passed the Civil Rights Act, Congress sought to give practical effect to those amendments. Tennyson might have concluded that with the passage of that legislation, justice had prevailed, and that the issue had been foreclosed. Yet in that period of American history discussed in this Opinion, Black Americans were still being deprived of the full complement of rights which this nation guarantees to its citizenry. Access to public facilities, the right to an equal educational opportunity, and the right to vote were among the panoply of privileges being withheld from Blacks despite the clarity of the Constitution and the laws of this country. Even today, and so proximate to the 1983 Law Day celebrations, simple justice for all persons remains elusive.

These clear constitutional rights were not contested in the instant lawsuit, but their echoes rang in the hundreds of exhibits I received and in the testimony which I heard. The disputed issue here was the question of the government's responsibility to give effect and meaning to our system of laws, and protect those who sought to exercise their rights of free action. I have decided that the government did have such a responsibility. Thus, while an appeal will almost certainly follow, a chapter has been concluded in Walter and Frances Bergman's quest for a fairer world.

Should we, as Americans, then, feel some abiding sense of shame because it takes so long to right wrongs traceable, in this instance, to slavery? The answer, of course, is yes. But we should also reflect on our progress, for this nation has made great strides in human justice. There ought to be a sense of pride in the realization that our accomplishments were wrung from noble labor. After all change is painful and always has been, even when that change is toward a more just society. Change requires accommodation and suffering. Pragmatism demands that we recognize that human frailty requires patience while, at the same time, we move forward. Change also requires a struggle.

Frederick Douglass was a runaway slave, with no formal education. In 1857 he commented on this struggle:

> Those who profess to favor Freedom and yet deprecate agitation, are men who want crops without plowing up the ground. They want rain without thunder and lightening. They want the ocean without the awful roar of its many waters.

> This struggle may be a moral one, or it may be a physical one, but it must be a struggle. Power concedes nothing without a demand. It never did and it never will....